THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RALPH LEHNER, Plaintiff in Error.

*Opinion filed June 22, 1927.*

1. CRIMINAL LAW—*defendant cannot be impeached by personal opinions of witnesses.* Witnesses testifying to the general reputation of the defendant for truth and veracity cannot base their testimony that such reputation is bad upon their personal opinions as to his truthfulness, and before testifying they should be made to understand that their testimony must be as to the general reputation of the defendant before his arrest or accusation.

2. SAME—*what is improper question to ask witnesses testifying to defendant's reputation for truth and veracity.* While it is proper, where witnesses have testified that the defendant's reputation for truth and veracity is bad, to ask such witnesses whether or not they would believe the defendant under oath, it is not proper to add to the question the words "in any matter in which he was personally interested," as such witnesses should not be allowed to consider the personal interest of the defendant, the effect of interest upon the credibility of testimony being solely for the consideration of the jury.

3. SAME—*ruling on motion for special counsel to assist State's attorney must be in bill of exceptions.* A motion and affidavit for special counsel to assist the State's attorney, and the objection and exception to the ruling thereon, must be made a part of the bill of exceptions before the ruling can be assigned as error for the consideration of the Supreme Court, and the clerk of the court can not make such ruling a part of the record by copying into the record the motion, objection, ruling and exception and certifying to them as a part of the record.

4. SAME—*what evidence as to other offenses is not proper impeachment.* It is not proper in the cross-examination of the de-

fendant and his witnesses to attempt to show his accusation and arrest for other offenses, as only the record of conviction of an infamous crime can be admitted to impeach a witness; and where the defendant is the principal witness in his own behalf the damaging effect of attempting to show his connection with other offenses cannot be cured by the mere sustaining of objections to the improper questions.

5. SAME—*when instruction as to effect of recent possession of stolen property should not be given.* While the recent, exclusive and unexplained possession of stolen property soon after a theft is sufficient to authorize a conviction of larceny, such an instruction is misleading and should not be given where the defendant admits the possession of the stolen property, the issue being as to the truthfulness of his explanation that he acquired the property in ignorance of its theft.

WRIT OF ERROR to the Circuit Court of Jo Daviess county; the Hon. HARRY EDWARDS, Judge, presiding.

FRANK T. SHEEAN, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, F. J. CAMPBELL, State's Attorney, and FRANKLIN J. STRANSKY, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Ralph A. Lehner, (hereinafter called defendant,) was convicted in the circuit court of Jo Daviess county on an indictment charging him with the larceny on January 29, 1926, of four brood sows and one barrow, of the value of $184, the property of Christopher Randecker. The jury found the value of the hogs stolen to be $100.80 and the defendant's age to be thirty-five years. Motions in arrest of judgment and for a new trial were overruled and the defendant was sentenced to the penitentiary for an indeterminate term of not less than one nor more than ten years. He prosecutes this writ of error to review the record.

The defendant was an unmarried man who lived with his parents and operated his father's farm in Jo Daviess

county. The complaining witness, Christopher Randecker, operated a farm located about five miles from the farm occupied by the defendant, and on January 27, 1926, had on his farm thirty-two red Duroc Jersey hogs. He fed these hogs about five o'clock on that evening and counted them. On the following morning, about eight o'clock, he again saw the hogs, counted them and found that four brood sows and one barrow were missing. He also found in the lot where he kept the hogs a rope, with a noose tied in it, and on this rope there were red hog hairs. He made inquiries at the various meat markets and shipping stations in neighboring towns and then went to Elizabeth and inquired of Norman Gault, a stock buyer there, concerning the missing hogs. He then went to the stock yards owned by Gault, and among 130 or more hogs he identified the four sows and the barrow belonging to him. He was able to identify these hogs because of their breed, color, size and general appearance and also by certain marks and peculiarities. The hogs were returned to him by Gault, and when he returned them to his hog lot part of them went to the feeding trough and part of them into the hog house. An examination of all of these hogs after their return to Randecker showed that the hair had been rubbed off of the hind leg, around the hock, of all five of the hogs and all of them were lame in the leg so rubbed. The undisputed evidence in the record is that these five hogs were sold to Gault by the defendant, together with four other hogs, about noon on the day the complaining witness discovered they were missing from his hog lot. Defendant received $100.80 for these five hogs.

The defendant testified in his own behalf in substance as follows: He owned a corn-shredder and silo-filler, and during the fall of 1925 these implements were operated by his brother, Roscoe Lehner, and Ralph Tiesch, under an agreement with him that after the deduction of operating expenses he was to have one-half of the profits and his

brother and Tiesch were to have the other half. They did
the collecting on a majority of the corn-shredding jobs,
and when they settled up Tiesch owed the defendant $42.
About the middle of January, 1926, the defendant talked
to Tiesch about paying him the $42. Tiesch told him that
two different people in the neighborhood for whom he had
worked owed him money and that he would pay him as
soon as he could collect the money owed to him. He and
Tiesch drove to the homes of two farmers Tiesch claimed
owed him, to collect his debt from them and pay the de-
fendant. About ten days before the larceny of the hogs
the defendant bought six hogs from Carroll Bros. and put
them in his hog lot with ninety or more hogs which he
there had. At that time Tiesch asked him if he wanted
to buy some more hogs, and told him he could get some
hogs from one of the two farmers who owed him, and
would do so and pay the defendant if he would buy them.
At this time Tiesch was staying at the defendant's home,
doing chores for his board. On the evening of January 27,
1926, Tiesch left the defendant's house between seven and
eight o'clock, and on the following morning, about seven
o'clock, the defendant met Tiesch, who called his attention
to five hogs which he had turned into a pen in the defend-
ant's barn with thirty or more other hogs, and asked him
what he would pay him for them. The defendant offered
him $82 for the hogs. After some dickering between them
Tiesch said he would take $82 for the hogs and pay him
what he owed him. Tiesch told the defendant he got the
hogs from one of the men whom they had gone to see to
collect the money that was owed Tiesch. After purchas-
ing the hogs from Tiesch the defendant called up the Gault
stock yards, at Elizabeth, and asked if they would buy a
load of hogs of him, and received an answer that they
would. He had been selling to Gault a wagonload of hogs
about once a week for some time, and was corroborated in
this by Gault or the employees that worked for him, who

also testified in this case. When he began to make up his load of hogs to take to the stock yards on the morning of January 28 he noticed that the five hogs which he had purchased from Tiesch were fighting his other hogs, and for that reason he included them in the load of nine hogs he took to Elizabeth on that day. He sold the hogs to Gault and received $100.80 for the five hogs he had purchased from Tiesch. Upon his return home he paid Tiesch $40 and retained $42 that Tiesch owed him. On the night of January 27, 1926, (the night the hogs were stolen from the complaining witness' hog lot,) he did not leave his home at any time after he ate supper until he went to his barn the next morning and met Tiesch and purchased the hogs from him. He ate supper at his home with his father, mother, sister, two brothers, his aunt and Tiesch, and all of them, except Tiesch and one of his brothers, remained there all evening with him, and he went to bed between eleven and twelve o'clock, midnight. On his return home after he was arrested he saw Tiesch, who again told him that he bought the hogs from the farmer who owed him and that there was nothing wrong with the deal. Tiesch then left the defendant's home for the express purpose of bringing the man to him from whom he had gotten the hogs, but he never returned and has not been heard of or seen in that neighborhood since. The defendant denied stealing the hogs and all knowledge of the fact that they were the complaining witness' property. He admitted on cross-examination he had told George Palmer that he had purchased the hogs from Tiesch and that he also told one of the officers who arrested him that he had raised the hogs, and that his latter story was not true.

The defendant was corroborated by his aunt, his father, his mother and his brother, all of whom testified that they ate supper with him the evening of January 27, 1926, about six o'clock, and were with him until between eleven and twelve o'clock, when he went to bed and slept there the

remainder of the night to the best of their knowledge. They also corroborated him in his statement that Tiesch was there and ate supper that evening and left after supper and did not return until the next morning. They gave as their reason for remembering these facts that that night was a bad, stormy and snowy night, and that the defendant was arrested upon this charge on the following Saturday, which came to their knowledge on the following Sunday. It was also clearly established by these witnesses that Tiesch, after hearing of the defendant's arrest on Sunday, left that neighborhood and has not been seen or heard of since, and this fact is not questioned.

Three witnesses for the State testified that they were acquainted with the general reputation of the defendant for truth and veracity, and that his reputation was bad and they would not believe him on oath in any matter in which he was interested. On cross-examination it developed that these witnesses were not testifying from their knowledge of his general reputation but that their answers were based upon their personal opinions as to his truthfulness. On motions of the defendant and the assistant State's attorney the testimony of these witnesses was excluded from the jury and the jury were instructed by the court to disregard their evidence. The testimony was excluded on the ground that the witnesses could only testify as to the general reputation of the defendant for truth and veracity and not from their personal opinions as to his truthfulness.

The testimony of the above three witnesses was objectionable for another reason. The witnesses, after testifying that the general reputation of the defendant for truth and veracity was bad, were all asked this question: "Based on that reputation, would you believe Ralph Lehner under oath in any matter in which he was personally interested?" Over the objection of the defendant they were allowed to answer, in substance, that they could not or would not believe him under oath. This mode of impeachment is con-

fined to general reputation. Impeaching witnesses who testify they are acquainted with the general reputation of the defendant for truth and veracity in the neighborhood in which he lives and that his reputation in that particular is bad may also be asked this further question: "From that reputation, would you, or not, believe him under oath?" It is error to allow such witnesses to also consider in such a question the matter of the personal interest of the defendant in the result of the suit or any other personal interest. The effect of interest upon the credibility of testimony is solely for the consideration and judgment of the jury, and no witness should be allowed to pass his judgment upon that question. (*Massey* v. *Farmers' Nat. Bank,* 104 Ill. 327.) It should have been ascertained by the prosecutor, before allowing these witnesses to answer any of the questions, that they were testifying as to the general reputation of the defendant before this prosecution was begun, and that they understood what was meant by "general reputation," and that they could not answer from their mere opinion or belief as to his truthfulness. It appears from the evidence of one or more of these witnesses that they based their evidence partly upon what people generally said about the defendant in his neighborhood and partly upon their opinion of him, and one of the witnesses, when asked whom he had heard talk about his reputation, answered that he had heard Chris Randecker say, "since last January," that he would not believe him under oath, and that he had heard "Art Ehrler say so in the State's attorney's office." It is evident from the examination of this witness that Randecker and Ehrler made those statements after the prosecution had been begun and were basing their statements upon facts which they had learned in this particular case. This evidence was very damaging to the defendant, and the exclusion of it from the consideration of the jury can not be regarded as leaving the jury free from prejudice against the defendant. The jury in all cases should be al-

lowed to pass upon the facts of the case and upon the truthfulness of the defendant based upon proper testimony.

There is found in the common law record in this case a motion by the State's attorney that special counsel be appointed by the court to assist in the prosecution of the defendant. There is also a showing in this part of the record that the defendant objected to such appointment and that his objection was supported by affidavit, and that the objection was overruled by the court and an attorney was appointed as special counsel to assist the State's attorney. The ruling of the court on the foregoing motion is assigned as error by the defendant. All motions and affidavits of this character before a trial court, and the objections and exceptions to the rulings thereon, must be made a part of the bill of exceptions before they can be considered by this court as part of the record. The clerk of the court cannot make them a part of the record by copying them into the record and certifying to them as a part thereof. *Hiler* v. *People,* 156 Ill. 511; *McNamara* v. *People,* 183 id. 164; *Saunders* v. *McCollins,* 4 Scam. 419.

In the cross-examination of the defendant and of the defendant's father and mother by the assistant State's attorney there was an attempt to show that the defendant, and others with him, were suspected and arrested for the violation of the Prohibition law, and that stories or rumors had been circulated to the effect that he had violated other criminal laws. The court sustained objections to all questions of this character. Nevertheless the attorney persisted and repeatedly asked similar questions, objections to all of which were sustained. The damaging effect of such improper examination could not be entirely withdrawn from the minds of the jury by the simple process of sustaining objections to the questions when asked. A defendant, when placed on trial for violation of the criminal law, can only properly be tried for the offense charged in the indictment. The general rule is that witnesses cannot be discredited, and

a defendant cannot be discredited as a witness or prejudiced in the trial of his case, by showing that they or he were arrested for other offenses or accused or convicted of the same. For the purpose of discrediting a witness in the trial of a cause it may be shown that he, whether a party to the suit or otherwise, has been convicted of an infamous crime, but such proof can only be made by the record showing such conviction. Conviction of an offense other than of an infamous crime cannot be proved for such purpose, either by the record or otherwise. It is the conviction of a witness of an infamous crime that may be proved for such purpose, and it is not admissible to prove that he has been arrested, accused of or tried for an infamous or other crime. (*Bartholomew* v. *People,* 104 Ill. 601.) Crimes that are deemed infamous and that may be proved for the purpose aforesaid are enumerated in paragraph 587 of the Criminal Code. We have announced this rule many times, and have held that it is the duty of the trial judge to promptly suppress any attempt to get any such improper evidence in the record, and where such is persisted in by counsel the court should promptly admonish counsel that he must not persist in such examination, in such manner as to prevent any further efforts in that direction.

The court gave the following instruction to the jury:

"The court instructs the jury, as a matter of law, that the recent, exclusive and unexplained possession of stolen property soon after the theft was committed of itself is sufficient to authorize a conviction unless the inference of guilt thereby raised is overcome by other facts and circumstances in evidence which create in the minds of the jury a reasonable doubt of such guilt, and in this case if you believe from the evidence beyond a reasonable doubt that the hogs mentioned in the indictment were feloniously stolen, taken and carried away in Jo Daviess county, Illinois, on or about January 29, 1926, as charged in the indictment and that said hogs were the personal property of said Christopher

Randecker as charged in the indictment and that the exclusive possession of said hogs were shortly after such theft found to be in the said defendant, Ralph A. Lehner, such facts are sufficient to authorize the conviction of the said Ralph A. Lehner unless the inference of guilt raised by such possession has been overcome by the evidence or by facts and circumstances in evidence which create in the minds of the jury a reasonable doubt of such guilt."

The foregoing instruction was likely to mislead the jury. It assumes, in the first place, that the possession of the recently stolen property was not explained by the defendant. His explanation, whether truthful or otherwise, was his real and only defense to the charge of larceny. It is true that the recent, exclusive and unexplained possession of stolen property soon after the theft was committed is sufficient to authorize a conviction. In a case where the defendant offers an explanation of his possession of the stolen property it is the province of the jury to consider that explanation together with all the other facts in the case, and if, after such consideration, the jury have a reasonable doubt of the defendant's guilt it is their duty to return a verdict of not guilty. If such explanation and all the other facts connected with the case are not sufficient to raise a reasonable doubt the jury should return a verdict of guilty. The jury should have been so instructed without leaving them to believe or to assume that such possession was unexplained by the defendant. The only charge in the case was larceny, and if the defendant's testimony, and that of his witnesses corroborating him, is true he could not be guilty of larceny. The rulings of the court on the evidence and the instructions should have been so guarded as to insure the defendant a fair and impartial consideration of his evidence under proper instructions of the court.

For the errors aforesaid the judgment of the circuit court is reversed and the cause remanded.

*Reversed and remanded.*