(No. 22595.—

The People of the State of Illinois, Defendant in Error, *vs.* Ernest Sanders *et al.* Plaintiffs in Error.

*Opinion filed October 22, 1934.*

Nealy I. Glenn, and Thurlow G. Lewis, for plaintiffs in error.

Otto Kerner, Attorney General, Marion M. Hart, State's Attorney, and J. J. Neiger, for the People.

Mr. JUSTICE HERRICK delivered the opinion of the court:

On December 14, 1933, an indictment was returned by the grand jury of Franklin county charging the plaintiffs in error (hereinafter called the defendants) with the robbery of the State Bank of Whittington while armed with a dangerous weapon. The defendants were placed on trial before a jury and found guilty. Motions for new trial and in arrest of judgment made by the defendants were each overruled and they were sentenced to the penitentiary. The record comes here on writ of error sued out of this court.

The errors assigned may be grouped as follows: (1) That the trial court admitted incompetent evidence; (2) that improper and prejudicial instructions were given on behalf of the People; (3) that the trial court erred in not directing a verdict of not guilty as to the defendant Sanders at the close of all the evidence in the case; and (4) that the court erred in entering judgment against the defendants.

About 11:30 A. M. on March 3, 1931, the State Bank of Whittington was robbed of $1129 by two men. Two men in a Ford Tudor coach parked the automobile in front of the bank building at Whittington, alighted from the car and entered the bank. Neither man was masked. There were in the bank at the time the robbers entered it, only two persons: Grover Payne, cashier, and M. H. Young, a director of the bank. Payne was behind the cashier's cage. Young was about eight or ten feet east of him and was also behind a cage. Each cage faced south. One of the two robbers, hereinafter referred to as the unknown man, approached the cashier, who at that time was busy with some of his bank duties. When the cashier had finished his work the unknown man had a conversation with the cashier relative to the opening of a savings account for a child. The cashier informed him the bank did not carry savings accounts. The evidence shows that the men had been in the bank up to this time about two or three minutes.

The man claimed to be the defendant Smith, and who is hereafter referred to as the shorter man, was during all this time standing immediately opposite and facing Young, who observed him closely. The unknown man at the conclusion of the conversation drew a revolver from his pocket, pointed it at the two officers of the bank and said, "This is a stick up; stick them up." The shorter man then also produced a revolver, came behind the cages and told Young and Payne to go to the west wall and stand with their hands to the wall. The men then proceeded to rob the bank. While the robbers were in the act of robbing the bank, Miss Louise Ludwig, a young lady twenty-four years old, entered the bank for the purpose of making a deposit. When she came in the shorter man came from behind the cage with a revolver in his hand and told her, in substance, to go behind the cage, face the wall next to Young, with her hands up, and to remain there. She did this and remained there until the robbers left. The two robbers were in the bank for ten and not to exceed fifteen minutes. During all that time they talked in the presence and hearing of Payne, Young and Miss Ludwig.

There is no dispute that only two robbers were in the bank building and participated in the actual, physical robbery of the bank. The record is barren of any evidence that there was any person accompanying the two robbers either to or from the bank. The money taken was placed by the robbers in money sacks which they obtained from the bank.

Inasmuch as the evidence against the two defendants is unrelated as to the commission of the robbery, we will first take up the case made by the record as to the defendant Sanders.

Whittington is about seven miles north of Benton, the county seat. A farm known as the Hickman farm lies near the southwest city limits of Benton. On the west side of this farm there is a timber. A north and south

highway skirts the woods and runs south across the rail-
road tracks into West City. Word came to Benton the
afternoon of the robbery that the men who had robbed
the bank were in the woods southwest of Benton. Judge
R. E. Hickman, who is the assistant State's attorney of
Franklin county, went with others in an automobile to a
point on the road running along the west boundary of the
woods on the Hickman farm, where an abandoned Ford
Tudor automobile was found. Judge Hickman was afoot
on this road between 2:00 and 3:00 o'clock, armed with
a shot-gun. Near the bridge that crosses a small stream
that comes out of the woods he saw the defendant Sanders
close to the road, near the top of a bluff in the woods.
Judge Hickman asked Sanders what he was doing in the
woods, and stated to him that there were men in there,
that the bank at Whittington had been robbed, and that
Sanders might be hurt by the men in the woods. The
evidence is that Sanders was not concealed but was in
plain view and that he voluntarily came over to where
Judge Hickman was. At that time he was carrying a sack
on his shoulder. He climbed over the fence near Judge
Hickman onto the public highway. Judge Hickman asked
him what he had in his sack, and he replied that he had
potatoes. Judge Hickman felt of the sack and discovered
that it contained money. He then turned Sanders over to
some other parties. Sanders was not armed. The potato
sack contained $100 in nickels, pennies and dimes within
a money sack. Sanders was taken to Benton and locked
up but later released.

There is testimony that on the way from the woods
to the jail Sanders said, in substance, that he was going
through the woods to see a party about some seed pota-
toes, and as he was coming through the woods he saw the
money in a stump and that he put the money in the potato
sack. At the jail that afternoon he told the sheriff, in sub-
stance, that while in the woods he saw a man who told

him where there was some money hidden, and said, in substance, that he wanted Sanders to get it, take it to his home, keep it for the stranger and deliver it Saturday night at the filling station in West City at 9:00 o'clock. Sanders also told the sheriff that he believed there was other money hidden in the woods about 500 feet east of where he found the money in the stump, and that the stranger told him there was money hidden there. Sanders and some officers then went to the woods, where they hunted in a northeasterly direction from where the money had been found in the stump, and the sheriff eventually found $570 hidden behind a log. Sanders did not take the men to any particular log or stump but told them what he claimed the man had told him about the vicinity where the money was hidden. Sanders assisted in the search. The last named money, with the exception of $100 in one-dollar bills, was in a package in a sack belonging to the State Bank of Whittington, and the cashier identified the figures on the wrapper of the package as being made by him.

Sanders is a coal miner living in West City. He has lived in that neighborhood about twenty-eight years and had never been arrested before he was arrested for the robbery under consideration. He testified in his own behalf. He stated that he was about his home all morning until about 11:45. He lives about one-quarter or one-half mile from the Hickman woods. He said that he left home about 11:45 carrying a scout ax and went over to the Hickman woods, where he dug up some sassafras roots to make tea; that he saw a man who weighed about 180 pounds, possibly heavier, who was dressed in a light-colored overcoat and light-colored hat. The man was a stranger to him. The man crossed the small branch above mentioned while Sanders was digging the sassafras roots, came to within 75 or 100 feet of him, asked him his name, which Sanders told him, then the man dropped his head and studied a bit, and said, "You look like a fair, honest man;

I will tell you something." The stranger told him there was some money in a stump on the side of the branch, near the bridge, and that from that stump, about 500 feet east, there was some more money. He further told Sanders to get the money and meet him at West City at the filling station or brick store on Saturday night. Sanders further testified that the man asked him what time the train left for Marion, and when informed that the train left about 7:45 that evening, walked on easterly and northerly and disappeared. Sanders said he returned to his home, made himself some sassafras tea, got to thinking about what the man told him and was curious to know whether he was told the truth; that he had been contemplating going to one of his neighbors to get some seed potatoes to plant in some vacant lots that he expected to rent for that purpose; that he started over to his neighbor's farm, going along the public highway running on the west side of the woods; that when he came to the neighborhood of the branch he turned off the road, went into the woods about 200 feet, looked for the stump and found the money; that the money was in a money sack, and that he put it in the potato sack he was carrying and went west from the stump to the road; that he was not over 200 feet from the road at any time when he was in the woods in the afternoon; that on his way out he saw Judge Hickman, whom he did not recognize at that time, armed with a shot-gun. He denied that Judge Hickman told him the bank at Whittington had been robbed. He denied any knowledge of the bank robbery or that he was in Whittington on March 3, 1931. He stated that he had no acquaintance with the defendant Smith; that he had never seen Smith until the two men met in a lawyer's office some two or three nights before their trial. He said he was excited when Judge Hickman stopped him; that Judge Hickman was, too; that Sanders was not asked any questions about the rest of the

money, and was so excited that he said nothing about it until he got to the jail.

Payne, Young and Miss Ludwig all testified that Sanders was not one of the two men who were in the bank and committed the robbery on March 3, 1931. Sanders is corroborated in his statement by several apparently honest and disinterested witnesses that he was in and about his own home in West City the entire morning of March 3, 1931, until between 11:30 and 12:00 o'clock. There is also testimony of some section men in relation to Sanders, some of whom saw and talked to him along the railroad track that day between 11:00 and 12:00 o'clock. He was seen to cross the railroad track carrying a scout ax between 11:00 and 12:00 o'clock and go into the Hickman pasture, which is about one-fourth mile from the railroad right of way.

The entire case made by the State rests upon the fact that Sanders was found in possession of part of the stolen property within a short time after the robbery, and upon the information given the officers of the vicinity where he thought more of the stolen money could be found, and that it was found in such vicinity.

The facts in the case as to Sanders are unusual. The evidence of his witnesses, exclusive of his own evidence, clearly establishes the fact that he was not in the vicinity of the bank at any time during the entire forenoon of the day on which the bank was robbed. It was uncontradicted that Sanders and Smith, the co-defendant, were complete strangers to one another. It is also true that while Sanders' story as to how he came into possession of the stolen money is quite out of the ordinary, yet it may be true. It has been often said that truth is stranger than fiction. We might add that more often fiction is stranger than truth. There is nothing to contradict Sanders' story, circumstantial or otherwise, in the record. It is also true that he did not tell the truth to Judge Hickman when in-

terrogated as to what he had in the potato sack. He also did not tell all of what he now claims to be the facts as to how he came into possession of the money or how he acquired the knowledge of where it was, until later in the day on which he was seized. However, he did on the same day relate substantially all of what he now says are the facts, and so far as this record shows he has never told any different or contradictory tale as to how the money came into his possession or what happened in the woods.

We do not regard the fact that Sanders denied that Judge Hickman told him that the Whittington Bank had been robbed as material. His conviction, after all, rests on the fact that he was found in the possession of a portion of the stolen money within a few hours after the robbery. It was therefore very material that the jury be accurately and correctly instructed on the legal effect of his possession of a portion of the stolen money.

A portion of the charge given by the trial court to the jury was objected to at the time by Sanders. The objection was overruled and exception taken. The portion of the charge objected to is as follows: "The recent possession of stolen property soon after the theft was committed, the explanation of said possession, together with all other facts and circumstances in evidence in the case not being sufficient to raise a reasonable doubt in the minds of a jury as to the guilt of the person in whose possession such property is found soon after the theft was committed, tends to establish the guilt of the person in whose possession it was found. The fact of itself, if you believe from the evidence beyond a reasonable doubt it is a fact, is sufficient to authorize a conviction unless the inference of guilt thereby raised is overcome by the explanation of the person in whose possession said property is found, and by other facts and circumstances in evidence which create in the minds of a jury a reasonable doubt of such guilt, and in this case if you believe from the evidence

beyond a reasonable doubt, that the money mentioned in the indictment was feloniously taken by robbery in Franklin county, Illinois, on or about the third day of March, A. D. 1931, as charged in the indictment, and that the money was the personal property of the State Bank of Whittington, a banking corporation, as charged in the indictment, and that the exclusive possession of said money, or any part thereof, was on the same day and a few hours after the alleged robbery, found to be in the said defendant, Ernest Sanders, such facts are sufficient to authorize a conviction of the said Ernest Sanders unless the inference of guilt raised by such possession has been overcome by the explanation of said defendant, Ernest Sanders, as to such possession, and by all the other facts and circumstances in evidence, which create in the minds of a jury a reasonable doubt of his guilt."

As to what is the legal effect of the possession of stolen property is a subject upon which the text writers and courts of the different jurisdictions not only do not agree but are in almost hopeless discord. Bishop states, in substance, that the modern doctrine is not that the possession of the stolen goods within a short or recent time after the theft or robbery is *prima facie* evidence of the guilt of the accused or a presumption of his guilt, but is a circumstance to be considered and weighed by the jury in connection with all the other evidence in the case. (3 Bishop's New Crim. Proc. sec. 740.) Our court has not gone to that extent but has clung to the doctrine that such recent possession of stolen property, unexplained, is sufficient to warrant a conviction for the theft or robbery by which the property was taken, and the instruction under consideration will be considered in that light. In *Miller* v. *People,* 229 Ill. 376, 382, an instruction similar to the one here given, but not nearly so lengthy or involved, was held to constitute reversible error. In *People* v. *Flynn,* 302 Ill. 549, 556, a similar instruction was

criticised in the use of the word "overcome," as tending to cast the burden on the defendant to prove he was not guilty. Instructions similar in principle were held erroneous in *Conkwright* v. *People*, 35 Ill. 204. An instruction somewhat similar to the one at bar was held to constitute prejudicial error. *People* v. *Lehner*, 326 Ill. 216.

The charge made that it was involved and confusing is properly lodged against the instruction. It is also subject to the vice complained against it that it is prejudicial to the rights of the defendant Sanders. The instruction three times stated to the jury, in substance, that the recent possession of stolen property is sufficient to raise a presumption of guilt and to authorize Sanders' conviction unless the inference of guilt thereby raised is overcome by the explanation of the person in whose possession said property is found, and by other facts and circumstances in evidence which create in the minds of a jury a reasonable doubt of such guilt. This last stated portion was also repeated three times in the instruction. It omitted all reference to the alibi of Sanders, which was uncontradicted, unless we can say that the possession of the stolen property did contradict the alibi, and we are not prepared so to hold in view of the record. The repeated use of the word "overcome" in the instruction tended to impress on the jury that the burden had shifted to Sanders and it was incumbent on him to prove his innocence. The burden of proof never shifts in a criminal case. The duty was not on Sanders to satisfactorily account for the possession of the stolen property, but the responsibility rested on the People throughout the trial, at all times, to prove him guilty beyond all reasonable doubt. *People* v. *Robinson*, 308 Ill. 398.

We now take up the case against the defendant Smith. The case against him turns on the question of identity. The witnesses testifying for the State and purporting to identify Smith as one of the men who robbed the bank

are Payne and Miss Ludwig. Both say that they had never seen Smith until the day of the robbery and never saw him thereafter until they saw him in jail at Benton, in November or December, 1933, after his arrest, which was approximately two and three-fourths years after the day of the robbery. Payne and Miss Ludwig testified that they were shown a photograph of Smith about four or five days before he was arrested. The circumstances under which they saw the photograph are not disclosed by the record. Payne, in the company of Dr. Buntin, president of the bank, saw Smith several times in the jail at Benton. On the trial, while Payne stated that he identified Smith as the shorter man of the two men who robbed the bank, he does not testify as to any mannerisms, tone of voice, scars or injuries, or as to how the shorter man was dressed at the time of the alleged robbery. None of the details upon which Payne identified Smith are related by him. He does describe the unknown man as weighing between 170 and 175 pounds and wearing a light-colored overcoat and a light-colored hat. After Smith's arrest Payne did not pick him out of any group of men and identify him as one of the robbers, but went to the jail with Dr. Buntin with the information that he would see one of the robbers of the bank. Miss Ludwig testified that Dr. Buntin called for her at her home and told her Smith, one of the men who robbed the bank, was in jail at Benton, and she went down to the jail with the doctor. A deputy sheriff, Dr. Buntin and the witness were the only ones present at the supposed identification. Smith was brought alone into the sheriff's office for the purpose of identification by the witness. Miss Ludwig testified that the man whom she saw in the bank the day of the robbery and whom she identified as Smith had a "cataracted eye" and was pock-marked. She further stated there was a film over the eye, and she supposed it was a "cataracted eye" although she had never seen one. She stated that at the time of

the robbery Smith had on a gray hat and white scarf. Young says the shorter man had on a black overcoat and a black hat with a low crown, and a spotted or striped scarf. Miss Ludwig limits her identification of Smith to her opinion that he was one of the robbers. Payne stated that he was impressed at the time by the fact that the unknown robber had a pock-marked face. Young testified that the shorter man had a long, red scar about two inches long and the width of a match, extending from the corner of his eye down the cheek and along his nose. He stated that Smith is not one of the two men who robbed the bank. There are no pock-marks and no scar on Smith's face. Young was contradicted on rebuttal by Payne and Dr. Buntin with reference to some statements alleged to have been made by Young and which he denied making. Payne testified Young told him on one occasion, "Dr. Buntin ought not to put it in the paper that we identified that fellow, because Sheltons are apt to get after us all." Dr. Buntin testified that Young told him that he thought Smith was the man who robbed the bank. On account of the view we take as to the identification of Smith we will not undertake to review all the evidence with reference to the case against him.

Smith testified in his own behalf. He is twenty-nine years old and has lived in Venice, Madison county, for twenty-five years. Most of that time he has been employed in the industries in Venice and neighboring cities. He testified that on March 3, 1931, he was working at the Wucheffennig restaurant, had worked there since about the first of January, and was employed there for about five or six months. He denied all connection with the robbery. He stated he had never been in Franklin county until brought there by the officers about the first of December, 1933, that he had no acquaintance with the defendant Sanders and had never seen him until he met him at his lawyer's office a few nights before the trial. Smith

has no scar on his face as described by Young and no pock-marks but does have some pimples on his face. He is blind in one eye, having lost the sight of the eye in an accident when he was a child. The eye is sometimes cloudy and at other times it is clear.

Considerable evidence was offered in rebuttal which it is not necessary to discuss here, but we call attention to the fact that Smith on his cross-examination was asked if he did not make the statement, in the presence of the jailer at Benton, that on March 3, 1931, he was in the alcohol business with the Shelton gang. The question was objected to and overruled. Smith denied making the statement. The jailer was not called. The question was only proper as an impeachment question, and no effort was made to make the impeachment after laying the supposed foundation therefor. In that situation the question should not have been asked. (*People* v. *Fiorita*, 339 Ill. 78.) In view of the other evidence in the record, we would not, however, reverse the case by reason, alone, of the asking of this question.

The subject of the manner of the identification and the weight to be given the evidence of identification has been before this court many times. We have heretofore called attention to the fact that where the witness is told, in advance of the identification, that the guilty party is in the custody of the police officials and the prisoner is produced alone for the purpose of identification, the weight of the evidence of identification is impaired. The proper way is to have the witness, without suggestion from any officers or any interested persons, pick out the guilty party from a number of persons unknown to the witness. (*People* v. *Crane*, 302 Ill. 217; *People* v. *Martin*, 304 id. 494; *People* v. *DeSuno*, 354 id. 387.) The identification here purported to be made was substantially two and three-fourths years after the first and only occasion when it is claimed the witnesses saw Smith.

We have given the evidence in this case careful consideration. After such review of the evidence of the identification we are constrained to hold that the identification of the defendant Smith as one of the robbers was not established beyond a reasonable doubt.

The judgment of the circuit court of Franklin county is reversed as to both the defendants, and the case is remanded for a new trial.

*Reversed and remanded.*