(No. 39002.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DANA HORTON NASH, Plaintiff in Error.

*Opinion filed Dec. 1, 1966.—Rehearing denied Jan. 17, 1967.*

276

Ward, J., took no part.

J. Robert Barr, of Chicago, appointed by the court, for plaintiff in error.

William G. Clark, Attorney General, of Springfield, and Daniel P. Ward, State's Attorney, of Chicago, (Fred G. Leach, Assistant Attorney General, and Elmer C. Kissane and Morton Friedman, Assistant State's Attorneys, of counsel,) for the People.

Mr. Justice House delivered the opinion of the court:

Dana Horton Nash was convicted in the circuit court of Cook County of the murder of John Kilpatrick and sentenced to the penitentiary for a term of 99 years to 150 years. We have jurisdiction to directly review this case.

The principal witness against the defendant was William Triplett. Triplett is about 8 years younger than defendant and is the defendant's nephew. They were both living in Detroit in October, 1961, and he asked to use defendant's car to drive to Chicago and visit his friends. Triplett testified defendant said that a man named Ralph Polk who works for a union in Chicago wanted him to come to Chicago and impose a beating on a man who had testified against Polk's boss, Inciso, because the beating of this man had been "muffed" by someone else and that he would get $500 for the job. Triplett said that defendant agreed to give him $250 for helping administer the beating.

They arrived in Chicago about 4:00 o'clock A.M. on October 19, 1961, and went to the home of Gloria and Chester Nietupski. After visiting for a while, the Nietupskis, Triplett and defendant went to a restaurant for breakfast. While they were in the restaurant, a car pulled up in front of the restaurant and defendant went out and talked with some people in the car. The Nietupskis then left for work and Triplett and defendant left to go to the home of the man they were to beat. Defendant told Triplett that he had seen Polk and that the man's habits and routine were the same as defendant had known them to be. After seeing the intended victim, John Kilpatrick, leave his home, they drove to his office and parked across the street. There was a heavy rain at the time and while they were parked there, a woman ran up and knocked on the window of the car. She said that she had an accident and her newborn baby was home alone. She asked if defendant would drive her home which he did. Defendant and Triplett then returned to the union office and they made their plan for the following day.

That evening they stayed at the Nietupski home and watched television. They left the next morning about 7:30 o'clock and went to the same restaurant as the day before and the defendant made a telephone call. They then went to the union office. Triplett got out of the car and defendant parked up the street. When Kilpatrick arrived, Triplett entered his car and asked him if he knew a certain street, and told him to slide over. Triplett had a gun in his hand and told the victim to look out the window of the passenger side. He drove about 200 feet into an alley where defendant was waiting. Defendant opened the door on the driver's side and took the gun from Triplett. Triplett leaned forward and defendant shot the victim in the back of the head. Triplett threw the keys from the victim's car into some shrubbery, and he and defendant drove away in defendant's car.

Defendant and Triplett then drove to a tavern and Triplett put the gun in the flush tank of a toilet in the men's washroom. Defendant left to get the money from Polk. Triplett, after having several drinks, returned to the Nietupski home. Later defendant arrived at the home and he and Triplett cut up the blood-stained clothing Triplett had worn and flushed the material down the toilet.

It is strenuously argued that the trial judge should have ordered a psychiatric examination of Triplett before the trial and allowed the psychiatric findings to go to the jury. Defendant filed a petition alleging that Triplett is a psychopath and asked that he be given a psychiatric examination at the State's expense in order to determine his competency as a witness. There is a letter attached to the petition addressed to defendant's attorney, signed by the Supervisor of Records of the State Prison of Southern Michigan. The letter deals with the several periods of Triplett's confinement in Michigan penal institutions between 1943 and 1962 when the letter was written. The letter also states that on January 18, 1955, a prison psychiatrist said that "He (Triplett) seems to be perfectly clear mentally and gives me the

impression as being a true psychopath who will probably most always be involved in a great deal of difficulty in the free world."

Defendant's contention is based on the premise that a person having a psychopathic personality is a pathological or psychopathic liar, unworthy of belief. He argues that psychiatric testimony should be permitted to impeach a principal uncorroborated prosecution witness. The land mark case in this area, he states, was the prosecution of Alger Hiss where the trial judge permitted psychiatric tests to impeach the credibility of the government's witness Whittaker Chambers. *United States* v. *Hiss,* 88 F. Supp. 559.

We note at the outset that our research indicates the psychiatrists are not entirely agreed as to what constitutes a psychopath or what characteristics and attributes a psychopath possesses. In 1952 authors of *Psychiatry and The Law* stated, "The term 'psychopath' is probably the most abused word in the whole psychiatric vocabulary. Etymologically, the word itself is nonspecific; it merely means a sick mind. Such ambiguous terms are readily subject to misuse. When a vague term is employed, it usually means that the concept which it represents is vague, and unfortunately, this is true of psychopathy. Some psychiatrists go so far as to suggest that both the term and the concept are completely meaningless and should be abandoned." Guttmacher and Weihofen, *Psychiatry and The Law,* (1952) p. 86.

It is well established that if a witness has the capacity to observe, recollect and communicate, he is competent. (*People* v. *Dixson,* 22 Ill.2d 513.) A psychopath has the capacity to observe, recollect and communicate and is therefore a competent witness. The question is whether it is permissible to show that he is a psychopath in order to impeach his credibility. Defendant argues that this type of evidence should be allowed in order to show that the person

is untruthful. This assumes, of course, that a psychopath tends to be more untruthful than other persons, a matter upon which the psychiatrists are not in agreement.

It has always been permissible to show that a witness, including the accused in a criminal case, if he takes the stand, has a bad reputation for truth and veracity. (*People v. Melnick,* 274 Ill. 616; *People v. Lehner,* 326 Ill. 216.) It would seem unnecessary to raise the issue of whether a witness is a psychopath, from which a jury could infer that he possesses the characteristic of untruthfulness, when direct evidence of a witness's reputation for truthfulness is admissible. The motivation of a psychopath to lie may be different from a normal person, (see Davidson, Forensec Psychiatry, (1952) p. 219) but the fact that he does lie, be he psychopath or not, is sufficient for the jury. We hold that the trial court did not err in denying defendant's petition for psychiatric examination of Triplett to determine whether Triplett was a psychopath.

It is next argued that the trial judge should have ordered the attendance of certain out-of-state witnesses. The defendant filed a petition under section 3 of the Uniform Act to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings, (Ill. Rev. Stat. 1961, chap. 38, par. 690.1—690.6, now sections 156—1 to 156—6 of the Code of Criminal Procedure of 1963,) alleging that Dr. David P. Phillips, John W. Martin, Pauline Watson, Ronnie Watson and Conrad Mikulin are material and necessary witnesses, that his defense cannot properly be presented without the testimony of those witnesses, that those witnesses are outside of the State of Illinois and their attendance cannot be compelled without the aid of the court.

The Uniform Act was enacted by the Illinois legislature in 1959 and has been adopted in some 45 states as well as the District of Columbia, the Panama Canal Zone, Puerto Rico and the Virgin Islands. (S.H.A. chap. 38, § preceding 156—1.) We have not heretofore been called upon

to construe this act. Its purpose is to provide a method of compelling attendance of witnesses in criminal proceedings who are outside of the State—a procedure which was unknown to the common law. Section 156—3 which deals with securing the attendance of witnesses from another State summoned to testify in this State, by its own terms, covers only material witnesses and should only be applied to material witnesses.

The petition filed by the defendant does not state any facts whatsoever showing that the witnesses named therein are material to his defense, nor did he or his counsel put any evidence in the record showing the materiality of the persons named. We hold that the trial judge was justified in refusing to certify that the persons named in defendant's petition were material witnesses when he has nothing before him but the names and addresses of the persons requested and a statement by defendant that these persons are material witnesses.

Defendant also contends that the trial court erred in denying his motion to have certain physical evidence submitted to a laboratory selected by the trial court for examination at the State's expense. The items mentioned in the motion were a gun and expended shell, torn strips of cloth and automobile seat covers and seat upholstery.

Joseph Surek testified that he worked at a tavern located at the corner of Archer and Cicero in Chicago. On December 2, 1961, he found a pistol and clip in the flush tank of the toilet in the men's washroom of the tavern. He took the pistol and clip to the Chicago police. John Stauffer, a firearms identification technician with the Chicago police department, testified that the pistol found by Surek had fired the bullet removed from the body of John Kilpatrick.

The record shows that in January, 1962, agents of the Federal Bureau of Investigation dug up the sewer line under the Nietupski's home and recovered pieces of cloth. These strips of cloth together with the automobile seat

covers and seat upholstery from the cars of Kilpatrick and defendant were examined by the Federal Bureau of Investigation. Blood from John Kilpatrick was found on the upholstery of his car, but no blood was found on the pieces of cloth recovered from the sewer line or from the seat covers or upholstery of defendant's automobile. The negative results of these examinations which were presented out of the presence of the jury were never introduced in evidence.

Defendant's contention that the physical evidence should have been submitted for examination to a laboratory selected by the trial court at the State's expense is similar to the assertion in *People* v. *Carpenter*, 13 Ill.2d 470, where it was argued that permitting the People to have three psychiatrists examine Carpenter to determine his sanity deprived him of due process of law. It was pointed out that Carpenter's assertion necessarily proceeds upon the assumption that the psychiatrists employed by the State were biased and prejudiced and that their testimony was not an honest evaluation of their examination. We held that the mere fact that only the State's psychiatrists had examined Carpenter in the absence of any showing that they did other than give their honest and unprejudiced opinion based upon their special knowledge and examination of him did not deprive him of any constitutional right.

Here there is nothing to show that the technician who testified concerning the murder weapon gave other than his honest and unprejudiced opinion based upon his special knowledge and his examination. The most favorable circumstance to the defendant that could arise from the examination of the upholstery of his car was that blood stains from the murder victim were not found on them. The People made no claim that they found blood stains from the decedent in defendant's car, and it would seem that defendants had the benefit of the fact as the evidence stands. We hold that the trial court did not err in denying further laboratory examination of the physical evidence.

Defendant argues that his conviction should be reversed because Triplett testified that the People had not promised him leniency if he would testify against Nash, when in fact the People had made such a promise. The record shows that Triplett was arrested in Detroit on October 31, 1961, for an armed robbery committed after his return from Chicago. He was questioned about the murder of John Kilpatrick, but he denied any knowledge of that crime. He received a sentence of from 6½ to 15 years for the armed robbery and this sentence was to run concurrently with any sentence he might receive in Illinois. He was extradited to Illinois. While being held in Chicago, he escaped from jail by overpowering his guards and taking their guns. He kidnapped a man and stole his car and money. He was later arrested in New York City for an armed robbery and returned to Chicago. He pleaded guilty to the Federal charge of kidnapping and intended transportation of a stolen automobile before the Nash trial, but he was not sentenced on those charges at that time.

At the trial, Triplett denied that he expected any leniency for his testimony against defendant, that he had no idea what sentence he would receive for his part in the murder and that no one had talked to him about receiving leniency in return for his testimony. Triplett's attorney later testified that he had discussed with him recommendations that the State's Attorney might make in return for the testimony against defendant. The lawyer told Triplett that the People would recommend a sentence of a definite number of years, not less than 14 years, if he would plead guilty and testify against defendant. The lawyer knew the exact number of years the People would recommend, but he did not give this specific number to Triplett. The lawyer also testified that he told Triplett that the People would make certain recommendations to the Federal court. The assistant State's Attorney assigned to defendant's case also testified and admitted that he had discussed with Triplett's lawyer

recommendations which the People would make in return for his testimony.

In *Napue* v. *Illinois*, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173, a principal witness for the People testified that he had received no promise of leniency in return for his testimony. The prosecution had in fact promised him leniency, but it did nothing to correct the false testimony. The Supreme Court held that the failure of the prosecutor to correct the testimony of the witness, which he knew to be false, denied Napue due process of law. We applied the holding of the *Napue* case in essentially the same fact situation in *People* v. *Lueck*, 24 Ill.2d 554.

There is a material difference in the *Napue* and *Lueck* cases and this case, however. In *Napue* and *Lueck* the prosecutor did nothing to correct the false testimony and the false testimony was unknown to the defendant at the time of the trial. Here the defendant knew of the false testimony and evidence was presented to show that promises of leniency had in fact been made. Under these circumstances there has not been a denial of due process of law.

It is next argued that the trial judge should not have admitted the testimony of Mrs. Marion Miklosh. She testified that on the morning of October 19, 1961, she and a friend took their children to school and while parked at an intersection their car was struck by a truck. She had left her baby at a friend's house and she began to walk to the friend's house. On the way, she passed through a parking lot across from Kilpatrick's union office where she saw two men sitting in a car. She asked the men for a ride to her friend's home and they took her there. She identified these two men as Triplett and Nash.

Mrs. Nietupski testified that when she returned home from work on October 19, 1961, defendant told her that he had visited his son at Great Lakes that day. Triplett testified that on October 19, 1961, he and defendant had planned their assault on Kilpatrick while they were at the

parking lot across from the union office. He said while they were at that parking lot a woman asked them for a ride home. The testimony of Marion Miklosh corroborated the testimony of Triplett concerning the conspiracy to do bodily harm to Kilpatrick and was properly admitted by the trial judge.

It is also argued that the trial court should have granted a new trial on the ground that after the trial Triplett executed an affidavit stating his testimony linking defendant to the murder of Kilpatrick was entirely false. In *People* v. *Marquis*, 344 Ill. 261, 265, this court stated, "Recantation by a witness of his testimony on a trial does not necessarily entitle a defendant to a new trial. Recanting testimony is regarded as very unreliable, and a court will usually deny a new trial based on that ground where it is not satisfied that such testimony is true." (See also Anno. 33 A.L.R. 550; Anno. 74 A.L.R. 757; Anno. 158 A.L.R. 1062.) The question therefore is whether the trial judge was justified in rejecting Triplett's recanting testimony at the hearing on the motion for a new trial.

We have examined Triplett's recanting affidavit and find that it was evasive, self-contradicting, unresponsive and in many respects highly improbable. He admitted that Mrs. Marion Miklosh had seen him and defendant in the parking lot across from Kilpatrick's office the day before the killing, but that they were in that area to "buy a hat or something." He said Chester Nietupski shot Kilpatrick, that he had known Nietupski only two days before the killing and that they were going to rob someone and just picked Kilpatrick as a random victim. In describing the shooting he said he was in the driver's seat of the Kilpatrick car, that Kilpatrick was in the middle and Nietupski was on the right.

As the trial judge pointed out, there are a number of circumstances which indicate Kilpatrick was not picked out as a random robbery victim. The work records of Nietupski

indicate he was working the day of the killing and the autopsy shows that the bullet entered the left side of Kilpatrick's neck and traveled upward to the right. These facts corroborate Triplett's trial testimony and are inconsistent with his recanting affidavit. Triplett's attorney testified Triplett never mentioned that Nietupski was involved in the murder, but he did state to him that defendant had committed the murder. Furthermore, the finding of the murder weapon, the keys to Kilpatrick's car and the pieces of cloth in the Nietupski sewer lend credence to the trial testimony. There is also evidence which indicates that after Triplett testified against defendant, he received a sentence in Federal Court which he thought was too severe and therefore made his recanting statement. We are of the opinion that the trial judge was justified in finding that Triplett's trial testimony was truthful and that his recanting testimony was false.

We have carefully reviewed the record and find that there was sufficient evidence to convict defendant and that he received a fair trial. The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.