328

*In re* ERROL BROOKS, a/k/a Errol Bariffe, *et al.*, Minors.—(THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOAN BARIFFE *et al.*, Respondents-Appellants.)

First District (2nd Division) No. 76-1342

Opinion filed August 8, 1978.

John D. Shullenberger, Joan D. Levin, and Roger B. Derstine, all of Legal Assistance Foundation, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Errol Brooks, a/k/a Errol Bariffe and Yvette Brooks, a/k/a Yvette Bariffe, were found to be neglected minors and were adjudged wards of the court. At a dispositional hearing on May 26, 1976, Richard S. Laymon, Guardianship Administrator for the Illinois Department of Children and Family Services, was appointed guardian of the two minor children with the right to place. An appeal is brought from the adjudications of wardship and subsequent placement orders by respondents, Joan Bariffe, mother of the two minors, and Fitz Bariffe, father of Yvette and stepfather of Errol.

The following issues are presented for review: (1) whether the findings of neglect and the adjudications of wardship are contrary to the manifest weight of the evidence; (2) whether the trial court erred in hearing Errol's testimony in chambers in the presence of counsel but outside the presence of respondents, Errol's parents; (3) whether the trial court erroneously admitted hearsay testimony; (4) whether the trial court erred in excluding testimony regarding Errol's reputation for truth and veracity; and (5) whether the trial court erred in admitting certain photographs into evidence.

We affirm.

Petitions for adjudications of wardship were filed on May 23, 1975, alleging that Errol Brooks, a/k/a Errol Bariffe (hereinafter Errol), and Yvette Brooks, a/k/a Yvette Bariffe (hereinafter Yvette), were neglected under section 2—4 of the Juvenile Court Act because their environment was injurious to their welfare. (Ill. Rev. Stat. 1973, ch. 37, par. 702—4.) The minors were placed in the temporary custody of Richard S. Laymon, Guardianship Administrator of the Illinois Department of Children and Family Services (hereinafter DCFS), and the petitions were set for hearing. On August 7, 1975, the temporary custody was vacated, and Errol and Yvette were returned to respondents under the supervision of DCFS. Respondents agreed to receive counseling and supportive services. Errol and Yvette were again placed in the temporary custody of Richard Laymon on September 9, 1975, and supplemental petitions for adjudications of wardship were filed.

The following testimony was adduced at the adjudicatory hearing on the petitions: Respondents, Joan Bariffe and Fitz Bariffe, were married in February 1968 and had a child, Yvette, in June 1974. In December 1974 Mrs. Bariffe's two other children Errol, age 13, and Michelle Brooks (hereinafter Michelle), age 10, came from Jamaica to live with respondents in Skokie, Illinois.

On January 9, 1975, the Bariffe house was destroyed by fire. Evelyn Christiansen, a neighbor of respondents, testified that the children were home alone when the house caught fire, that she called the fire department and then spoke with Errol to make sure that everyone was out of the house, and that at this time the children looked normal and healthy. Respondents and their children resided at a motel in Skokie for several months after the fire.

On February 10, 1975, Skokie Police Officer David Hussey was called to Dabbs Pharmacy where he found Errol crying and complaining that his mother beat him. Officer Hussey took Errol to the police station and turned him over to Officer Zerfass. Officer Zerfass testified that he asked Mrs. Bariffe to come to the station, which she did, and she told him that she did not hit Errol on February 10 but she struck him the day before for not doing his chores. Officer Zerfass released Errol to Mrs. Bariffe.

James Leslie, a friend of respondents, testified that on two occasions in early February 1975, while visiting respondents at the motel, he saw Mrs. Bariffe slap Michelle and Errol in the face. Leslie stated that Mr. Bariffe told him Mrs. Bariffe was taking advantage of the children and had hit Errol in the face with a shoe and then told Errol to tell his teachers the swelling was due to a tooth extraction.

Errol and Michelle went to the Skiles School in Skokie. On February 20, 1975, Michelle went to the office of Cele McGonagle, a registered nurse employed at Skiles School. Ms. McGonagle testified that she observed a

large bruise under Michelle's left eye and temple area. Errol reported to the nurse's office on February 27, 1975, when Mary Boggis, also a registered nurse employed at Skiles School, was working. Ms. Boggis noticed a blood blister on Errol's finger. On February 28, 1975, Ms. Boggis saw Errol, took his temperature which was determined to be 101°, and had Errol rest on a cot. Yolande Robbins, a teacher at Skiles School, testified that in early March 1975 on the day for parent conferences she spoke to respondents, and Mrs. Bariffe told her not to indulge Errol because he was a capable student, but he was lazy. Mrs. Bariffe told Ms. Robbins that she believed in corporal punishment. On March 17, 1975, Ms. McGonagle saw Errol and observed a scrape on his elbow and a swelling below his left eye. She examined Errol on March 19, 1975, and observed a large bump on his head.

Ms. McGonagle testified that on March 26, 1975, she examined Michelle but observed nothing unusual; however, she contacted the school social worker, Valee Reed, and had Michelle rest on a cot all afternoon. Ms. Reed testified that on March 26 after talking to the school nurse, she contacted DCFS and requested that they investigate suspicions of neglect and abuse of Errol and Michelle. Ms. Reed stated that on the same day she saw Michelle and noticed bruises and scars on her back and wrist.

Ms. McGonagle examined Michelle on March 27, 1975, and observed a bruise the size of a 50-cent piece on Michelle's left cheek and a slight cut on her chin. Ms. Reed spoke with the school nurses and Michelle, and as a result she contacted the Skokie police and arranged a meeting with respondents, the police, the school nurses and a representative from DCFS. Skokie Police Officer Rappe, who responded to Ms. Reed's call, testified that he went to Skiles School and spoke with the principal, a school nurse and Ms. Reed. He met Errol and Michelle and noticed a bruise on Michelle's left cheek and a swelling on her upper lip. Officer Rappe then went to the motel where respondents were residing and had a conversation with respondents in which Mr. Bariffe stated he never did strike the children. Mrs. Bariffe stated that she did strike her children because she believed in stern punishment, but that she did not intend to hurt or bruise them. Mrs. Bariffe told Officer Rappe that she was aware of scars on Errol and Michelle, but these were attributed to their growing up in Jamaica where they would run in the fields and thick grass. Officer Rappe stated that Mrs. Bariffe showed him a belt which she used on the children, stating that she used whichever end came to her hand, and that he kept the belt with Mrs. Bariffe's consent. The belt was admitted into evidence.

Officer Rappe then went with respondents to Skiles School. At the meeting on March 27, 1975, with school officials, Officer Rappe and a representative from DCFS, Ms. Reed informed respondents of the

school's concern about repeated absences and possible abuse of Errol and Michelle. Ms. Reed testified that Mrs. Bariffe was shocked at the accusation and stated that the children had to be disciplined. Officer Rappe told respondents that unless they agreed to submit to a social investigation he would take Errol and Michelle into his custody. Mrs. Bariffe agreed to allow a representative of Child and Family Advocates to visit her home every three days.

During the first week of April 1975, Barbara Phillips, a neighbor of respondents, began serving as a baby-sitter for Yvette five days a week. Mrs. Phillips testified that Yvette's physical appearance was good and that she never noticed any bruises on Yvette. She stated that Yvette seemed very attached to respondents. Ms. Robbins, the teacher, testified that in late March and early April 1975 she noticed that Errol had bruises and scratches on his face and a puffiness around his eyes. Ms. Robbins stated that she spoke to the school social worker. On April 8, 1975, Ms. McGonagle saw Michelle and observed a bruise around Michelle's left eye. Ms. McGonagle then spoke with the school social worker. Ms. Robbins noticed fresh bruises and scratches on Errol's face in mid-April and contacted the social worker.

On May 21, 1975, Skokie Police Officer Hussey was called to the Bariffe residence where he was met by Mr. Bariffe and a family friend. Officer Hussey observed Michelle lying on a cot with no signs of life, so he laid Michelle on the floor and administered cardio-pulmonary resuscitation until fire department paramedics arrived and transported Michelle to Skokie Valley Hospital. At the hospital, Mr. Bariffe told Officer Hussey that Michelle had fallen in the bathtub and struck her head. Officer Hussey testified that he observed Michelle's body at the hospital and noticed numerous bruises, welts and scars. Officer Anton, an evidence technician with the Skokie Police Department, testified that he took photographs of the bedroom and bathroom in the Bariffe residence and of the body of Michelle in the emergency room of the hospital on May 21, 1975. Officer Anton identified the photographs and they were admitted into evidence over objection by respondents.

Dr. Konacki, a coroner's pathologist for Cook County, testified that on May 22, 1975, he examined and performed an autopsy on the body of Michelle and observed hemorrhages under both eyelids, a scar on the left eye, small abrasions on the lips, neck and chest, bruises on the chest, arms, forearms and knees, and multiple bruises and scars on the hips and thighs. The autopsy revealed recent and older hemorrhage of the skull, a swollen skull, a swollen and flattened brain, congested lungs, and hemorrhages around the kidneys. Dr. Konacki stated that the main cause of death was cranial injuries, and that the cause of the abrasions and bruises was trauma or external pressure. He then identified several photographs as portraying

various parts of Michelle's anatomy and internal organs. These photographs were admitted into evidence over objection by respondents.

On May 23, 1975, Errol and Yvette were placed in the temporary custody of Richard S. Laymon, DCFS guardianship administrator, and petitions for adjudications of wardship of both minors were filed. On August 20, 1975, Errol and Yvette were returned to respondents under supervision of DCFS. Mrs. Phillips, respondents' neighbor, testified that in mid-August she observed Errol with a swollen jaw, and Errol told her, with his mother present, that the swelling was caused by a tooth.

On September 9, 1975, Skokie Police Officer Frederick Murray was called to the home of Theresa Fishback, who lived two blocks from the Bariffe residence. Mrs. Fishback testified that at 7:50 a.m. on September 9, 1975, a young boy came to her home and asked her to call the police because his mother had beaten him with a cricket bat. She stated that the boy's face was bloody and swollen, and that she had her daughter call the police. When Officer Murray arrived, she heard the boy tell the officer that his name was Errol Brooks. Officer Murray testified that Errol had a swollen jaw and bruises under his right eye, back, chest and arms. Officer Murray called an ambulance and then went to Skokie Valley Hospital with Errol.

Juvenile Officer William Zerfass testified that he observed Errol at the hospital on September 9, 1975, and noticed a swelling on the left side of his face and arm and bruises on his back and shoulder. Officer Zerfass spoke with Mrs. Bariffe, telling her that Errol alleged she had beaten him with a cricket bat. Mrs. Bariffe stated that Errol's face was swollen due to an abscessed tooth, but that she had hit Errol with a curtain rod to discipline him. Officer Zerfass arrested Mrs. Bariffe.

Errol testified in the court's chambers that on September 9, 1975, at 6 a.m. his mother hit him with a cricket bat because he ate some Jamaican fruit, and that he ran out of the house. Errol also stated that his mother hit him the previous day for eating some fruit, and that five or six days earlier she hit him in the head with a shoe.

Jack Sternfeld, a physician licensed to practice in the State of Illinois and associated with Skokie Valley Hospital, testified that on September 9, 1975, he was working in the emergency room of the hospital, and he performed a physical examination of Errol. Dr. Sternfeld observed a swelling and discoloration of Errol's left cheek down to the left lip, a split of the inside cheek, a series of welts on the neck and right shoulder and a swelling of the left arm. Dr. Sternfeld stated that he questioned Errol concerning his medical history, and Errol stated that his mother had hit him with a cricket bat and her fists. Dr. Sternfeld stated that the injuries he found were consistent with Errol's story.

On September 9, 1975, Errol and Yvette were placed in the temporary

custody of Richard Laymon. Errol was placed in the foster home of Maude Jackson. Mrs. Jackson testified that Errol originally told her that his face was swollen because his mother had hit him. A few days later Errol changed his story and told Mrs. Jackson that he fell off his bicycle and had injured his face. During mid-September Errol told Alma Kyles, who had been his foster mother during the summer of 1975, that he was injured when he fell off a bicycle.

Robert Leahy, a social worker with DCFS, testified that he first met Errol on September 15, 1975, when Errol was in a foster home, and Errol denied being beaten by his mother. Mr. Leahy stated that on September 30, 1975, he saw Errol at Maryville Academy, and that while no one else was present Errol stated his face was swollen because he fell off his bicycle. Mr. Leahy testified that he had known Yvette from September 1975 to the present; that he observed Yvette in the company of her parents approximately 11 times in the Bariffe home, and Yvette related well to respondents and respondents accepted her.

Errol admitted that he told his foster mothers and the social worker that his mother had not hit him but he had fallen off a bicycle and hit his head. Errol stated that when his mother came to see him in the foster home, she told him to change his story, and he did so because he was afraid of his mother.

After closing arguments, the court entered a finding of neglect of Yvette based upon her environment, and a finding of neglect of Errol based upon abuse of him by respondents. The court also entered adjudications of wardship and a finding that it was in the best interests of Yvette and Errol to be adjudged wards of the court.

On May 26, 1976, a dispositional hearing was held. The State introduced a clinical evaluation conducted by Dr. Blanchard Reeb on October 22, 1975. The evaluation, which was admitted into evidence by stipulation, concluded that in the doctor's opinion there was physical injury and abuse in the Bariffe home and neither child should be returned to respondents. Dr. Reeb found that neither parent demonstrated a disturbance in orientation or evidence of overt psychosis or gross impairment of judgment, but that both parents appeared to have mild to severe personality disorders. Dr. Reeb found that Errol showed evidence of rather acute overanxious adjustment reaction of adolescence.

Respondents presented four witnesses. Robert Leahy testified that as the social worker he had met with the Bariffe family several times from September 17, 1975, to the present and had occasion to observe Yvette and Errol interact with their parents, and that he had reviewed reports from the other agencies working with the family. Mr. Leahy stated that in his opinion Yvette should be returned to respondents because she was at ease with them, but that Errol should not be returned at this time. Mr.

Leahy recommended family counseling on a weekly basis for approximately six months. Mr. Leahy stated that in his opinion neither Errol nor Michelle had been abused, and he took this into account in making his recommendation.

Dr. Nahman Greenberg testified that he was a consultant to DCFS and he interviewed respondents and reviewed the materials in the Bariffe file at DCFS, and that on three occasions he observed Yvette in the presence of her parents. Dr. Greenberg stated that, in his opinion, respondents did not appear to have a major psychiatric disorder and were able to relate to Yvette and were competent to take care of Yvette. Dr. Greenberg recommended that Yvette be returned to respondents and that the family be counseled.

Holly Karr, a child advocate with the Community Advancement Program, testified that from January 1976 to the present she took Yvette to the Bariffe home two or three times a week for visits with her parents, and that she observed respondents and Yvette together. Ms. Karr stated that respondents were very loving and affectionate with Yvette and Yvette was excited when she went to respondents' home, but she was unhappy when she had to return to the foster home.

Kenneth Watson, assistant director of the Child Care Society, testified that he interviewed respondents and Errol, reviewed DCFS records on the case and observed Yvette in the Bariffe home. Mr. Watson stated that, in his opinion, respondents are competent parents and would be adequate parents for Yvette. He noted that since the separation of Errol and Yvette, respondents had another child, Suzette, and have indicated competent parenting for the new child. However, Mr. Watson concluded that it would be unwise to return Errol to respondents. In his opinion it would be difficult for respondents to be parents for Errol because Errol had developed his own personality outside the family unit and has undergone several traumatic circumstances since his arrival from Jamaica. In reference to Yvette, Mr. Watson stated that he observed a good and loving relationship between Yvette and respondents and he believed that there would be no risk of harm to Yvette if she were returned to respondents. Mr. Watson recommended family counseling.

The court entered a finding of unfitness of respondents and a finding that it was in the best interests of Errol and Yvette to be placed outside respondents' home. The court appointed Richard S. Laymon, DCFS guardianship administrator, as guardian with right to place.

## I.

Respondents initially contend that the findings of neglect of Errol and Yvette and the adjudications of wardship are contrary to the manifest weight of the evidence.

■■■ Under the Juvenile Court Act, a child is neglected if his or her "environment is injurious to his welfare." (Ill. Rev. Stat. 1975, ch. 37, par. 702—4(1)(b).) Generally, "neglect" is the failure to exercise the care that circumstances justly demand and it embraces wilfull as well as unintentional disregard of parental duty. (*In re Stilley* (1977), 66 Ill. 2d 515, 363 N.E.2d 820; *People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 104 N.E.2d 769, *cert. denied* (1952), 344 U.S. 824, 97 L. Ed. 642, 73 S. Ct. 24.) Section 4—8 of the Juvenile Court Act indicates that physical abuse of a child may constitute neglect. (Ill. Rev. Stat. 1975, ch. 37, par. 704—8(2).) However, the term "neglect" does not have a fixed meaning; rather, the term acquires content from the specific circumstances of each individual case. (*In re Stilley; In re Gomez* (1st Dist. 1977), 53 Ill. App. 3d 353, 368 N.E.2d 775.) Cases involving an adjudication of neglect and wardship are in effect *sui generis*, and each case must be decided on its own particular facts. (*In re Grant* (1st Dist. 1975), 29 Ill. App. 3d 731, 331 N.E.2d 219; *In re Stacey* (1st Dist. 1973), 16 Ill. App. 3d 179, 305 N.E.2d 634.) The proper standard of proof is a preponderance of the evidence. (Ill. Rev. Stat. 1975, ch. 37, par. 704—6.) Our supreme court noted in *In re Stilley* that the determination of neglect is within the province of the trial court, and its decision must be given respectful weight because the trial court had the opportunity to observe the demeanor and conduct of the parties and witnesses. The court stated at page 520:

"The delicacy and difficulty of child-custody and child-neglect cases justify the burden of responsibility placed on the trial court and the ensuing deference which must be given to the trial court."

Thus, the trial court's determination will not be disturbed unless it is contrary to the manifest weight of the evidence. *In re Stilley; In re Gomez.*

Since each child was the subject of a separate petition, and since the purpose of the Juvenile Court Act is to secure care and guidance for "each minor" (Ill. Rev. Stat. 1975, ch. 37, par. 701—2), the findings as to Errol and as to Yvette will be considered separately.

■■ In reference to Errol, the finding of neglect and the adjudication of wardship are supported by the manifest weight of the evidence. The record indicates that on several occasions Errol sustained serious marks and bruises on his body. In February 1975 Errol complained to police that his mother had beaten him, and a friend of respondents saw Mrs. Bariffe hit Errol in the face. In March and April 1975 school officials observed serious bruises and scars on Errol and contacted the police and DCFS on three occasions to investigate possible abuse. Mrs. Bariffe told social workers and police that she believed in stern punishment, and she admitted hitting Errol with a belt. In September 1975 Errol was observed

with bruises on his face and arms and with a swollen jaw, and police took Errol to Skokie Valley Hospital to be examined. The examining physician testified that Errol had a swelling on his cheek and left arm and a series of welts on his neck and shoulder and that Errol's injuries were consistent with Errol's account of a beating. Mrs. Bariffe denied hitting Errol with a cricket bat as Errol claimed but told police that she hit Errol with a curtain rod for discipline purposes. Based upon the foregoing evidence, it was not error for the trial court to conclude that Errol was physically abused, and that such abuse was caused by respondents.

In reference to Yvette, evidence was presented in order to establish that her environment was injurious to her welfare. The State presented the aforementioned evidence of abuse of Errol and also presented evidence of the physical abuse of Michelle. The record indicates that from February 1975 through April 1975 Michelle was observed by school officials with severe bruises and scars, and they contacted DCFS and the police; and that on May 21, 1975, Michelle died as a result of cranial injuries caused by trauma or external pressure. The physician who performed an autopsy on Michelle's body testified that he observed bruises and scars on the face, neck, chest, arms, thighs and knees. Mr. Bariffe told police that Michelle had fallen in the bathtub and hit her head. There was no evidence of any physical abuse of Yvette. A neighbor of respondents, who baby-sat for Yvette, testified that she never noticed any bruises on Yvette, that Yvette's physical appearance was good, and that Yvette seemed very attached to respondents. Mr. Leahy, a social worker, also testified that Yvette related well to respondents and respondents accepted Yvette.

The State contends that the evidence of abuse of Errol and Michelle establishes an environment that is injurious to the welfare of Yvette. Respondents agree that evidence of neglect or abuse of one child may be relevant to a determination of whether a sibling is subjected to an injurious environment. However, respondents contend that the abuse of one child cannot support a finding of neglect of a sibling absent evidence of neglect or abuse toward such sibling.

There does not appear to be any Illinois case directly on point. Respondents cite *In re Nyce* (1st Dist. 1971), 131 Ill. App. 2d 481, 487, 268 N.E.2d 233, in which the court stated:

"The scope of authority of the Circuit Court to deal with minors under section 702—4 is limited to minors who are actually neglected and does not extend to those who are thought to be subject to neglect in the future."

However, in *Nyce* the parent of an allegedly neglected child never had custody of the child, and the lower court's finding of neglect was based upon the opinion of two social workers that the parent was not a fit and

proper person to raise the child. The appellate court found that the evidence did not establish that the child was neglected. The present case differs from *Nyce* because there was evidence of respondents' behavior with their children, including Yvette, and there was evidence of the home environment.

In *In re Robertson* (3d Dist. 1977), 45 Ill. App. 3d 148, 359 N.E.2d 491, a child was found to be neglected and was placed outside the parental home. In a supplemental proceeding to determine whether the parents were unfit, the court stated that the unexplained death of a second child was evidence that the home environment was injurious to the welfare of the neglected child. The court found that the parents were unfit because they failed to make reasonable efforts to correct the original conditions which led to a finding of neglect. Although *Robertson* differs from the present case because there was evidence of neglect of the particular child in question, the decision indicates that an injurious environment may be the result of the parents' behavior toward a sibling.

Courts in several other jurisdictions have found a child to be neglected on the basis of treatment accorded other children in the family. (*In re C.R.* (Colo. App. 1976), 557 P.2d 1225; *In re A.A.* (Mo. App. 1976), 533 S.W.2d 681; *In re Miller* (1952), 40 Wash. 2d 319, 242 P.2d 1016.) The Missouri Court of Appeals noted in *In re A.A.*, at page 684:

> "Cases such as this of maltreatment of a prior child present one of the few situations in which a juvenile court, and the social agencies at its instance, can be alerted to take before-the-fact protective measures. The importance of court intervention in such cases, even though no damage to the second infant is manifest, lies in the knowledge that neglect or abuse by a parent with a propensity toward it is often triggered by the child's growth."

■■■ It is true that a court may not speculate as to the future care of a child. However, it is also well-established that the primary consideration in a child-neglect case is the best interests and welfare of the child. (*In re Stilley.*) When faced with evidence of prior abuse by parents, the juvenile court should not be forced to refrain from taking action until each particular child suffers an injury. As the court stated in *In re Miller* at page 1018, "[a parent] does not have the privilege of inflicting brutal treatment upon each of his children in succession before they may individually obtain the protection of the state." It was not unreasonable for the trial court to conclude that Yvette was subjected to an environment of physical abuse and that it was in Yvette's best interests to adjudicate her a ward of the court. The finding of neglect and adjudication of wardship was not against the manifest weight of the evidence.

■■ Respondents contend that the court abused its discretion by placing Yvette under the guardianship of DCFS because the evidence established

that Yvette's best interests would be served by placing her in the parental home. We find that the court's determination is supported by a preponderance of the evidence. The court found that there was abuse in the home, and it was not unreasonable for the court to conclude that Yvette's welfare could not be adequately protected in the parental home at that time.

## II.

Respondents next contend that their right to confront all witnesses against them was violated when the court permitted Errol to testify in the court's chambers outside the presence of respondents, but with counsel for all parties present.

Section 1-20 of the Juvenile Court Act (Ill. Rev. Stat. 1975, ch. 37, par. 701-20) entitles respondents to certain rights including the right to be present and to cross-examine witnesses. However, the proceedings are not intended to be adversary in character. Ill. Rev. Stat. 1975, ch. 37, par. 701—20(1).

It has been held that in child custody cases the trial court in its discretion may interview a child alone in chambers and then make the substance of the interview a part of the record. (*In re Ross* (3d Dist. 1975), 29 Ill. App. 3d 157, 329 N.E.2d 333; *Oakes v. Oakes* (1st Dist. 1964), 45 Ill. App. 2d 387, 195 N.E.2d 840.) The rationale for allowing interviews in chambers is that the best interests and welfare of the child are determinative in custody cases and special care must be exercised by the court on behalf of the minor child. (*Oakes v. Oakes.*) In *Levy v. Levy* (1st Dist. 1969), 117 Ill. App. 2d 194, 254 N.E.2d 108, the court rejected the argument that an in-chambers interview in the presence of both counsel violated the parties' due process rights. It has also been held that in a case involving visitation rights the primary concern is the welfare of the child and thus the court may, in its discretion, conduct an interview with the child. *Regan v. Regan* (1st Dist. 1977), 53 Ill. App. 3d 50, 368 N.E.2d 552.

■■ Similarly, a child-neglect case is a nonadversary proceeding and the primary concern is the best interests and welfare of the child. (*In re Stilley.*) As in custody cases, the trial court must have discretion to interview the child in the privacy of chambers. Generally, there is an inherent fear in the child to testify, which may be an obstacle to ascertaining the truth. In the present case, Errol stated that he was afraid to testify in front of his parents. The court took steps to protect respondents' rights: counsel for both sides and a court reporter were present; Errol was subjected to cross-examination; and the interview was read into and made a part of the record. The record does not show that

the court abused its discretion in allowing Errol to testify in chambers or that respondents' due process rights were violated.

## III.

Respondents next contend that the trial court erroneously admitted hearsay testimony of two witnesses. First, Mrs. Fishback, who testified that a boy whom she did not know came to her home crying, was allowed to state over objection that the boy told her his mother beat him. Second, Dr. Sternfeld, who testified that he examined Errol in the emergency room at Skokie Valley Hospital, was allowed to state over objection that in response to his inquiry as to what happened, Errol told the witness that his mother beat him with a cricket bat. The State contends that although the testimony is technically hearsay, the testimony was admissible because the out-of-court declarant testified and was available for cross-examination.

■■■ Section 4—6 of the Juvenile Court Act (Ill. Rev. Stat. 1975, ch. 37, par. 704—6) provides that the rules of evidence of civil proceedings are applicable to adjudicatory hearings. Generally hearsay evidence is inadmissible at the adjudicatory hearing although it is admissible at the dispositional hearing. (*People ex rel. Jones v. Jones* (5th Dist. 1976), 39 Ill. App. 3d 821, 350 N.E.2d 826.) However, it has been held that the admission of hearsay evidence does not constitute reversible error where the declarant testified and was subject to cross-examination. (*People v. Marquis* (4th Dist. 1977), 54 Ill. App. 3d 209, 369 N.E.2d 372; *People v. Lewis* (1st Dist. 1977), 51 Ill. App. 3d 109, 366 N.E.2d 446; *People v. Burks* (1st Dist. 1969), 105 Ill. App. 2d 112, 245 N.E.2d 120.) The fundamental purpose of the hearsay rule is to test the real value of testimony by exposing the source of the assertion to cross-examination by the party against whom it is offered. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738; *People ex rel. Jones v. Jones*.) Although Illinois has not adopted a rule that makes hearsay admissible if the declarant is present (*People v. Robinson* (4th Dist. 1977), 52 Ill. App. 3d 658, 367 N.E.2d 1034), where the parties have an opportunity to cross-examine the declarant, any prejudice resulting from the improper admission is ameliorated, and the error is not a basis for reversal. *People ex rel. Jones v. Jones.*

■■ In the present case the declarant, Errol, testified and was subject to cross-examination. Even though Errol testified in the court's chambers and outside the presence of respondents, respondents had the opportunity to cross-examine Errol through their counsel who was present in the chambers. It is not the purpose of the hearsay rule to exclude all out-of-court statements; rather, the rule is designed to exclude

only those statements which the party against whom they are offered has no opportunity to test by cross-examination. (*Lewis*; *Burks.*) Since respondents had an opportunity to cross-examine Errol, the admission of testimony regarding out-of-court statements by Errol does not constitute a basis for reversal.

## IV.

Respondents next contend that the trial court erred in excluding testimony regarding Errol's reputation for truth and veracity. As their first witness respondents presented Alfreida Livingston, a social worker for Central Baptist Family Services. Ms. Livingston testified that she had known Errol for approximately two months and was assigned to work with him, and that she had occasion to talk to his foster parents, social workers and school personnel concerning Errol's behavior. Counsel for respondents then asked Ms. Livingston the following question:

"On the basis of your discussions with these individuals, do you have an opinion as to reputation of Errol Brooks for truthfulness and honesty?"

The State's objection to the question was sustained.

Respondents argue that the court erroneously denied their right to introduce evidence of Errol's reputation, stating that it is well-established that any witness who testifies may be impeached by showing his general reputation for truth and veracity. The State contends that the court properly excluded the testimony because a sufficient foundation was not laid and the question was in improper form. The State contends also that even if the question was proper, the exclusion constitutes harmless error.

■■ It is established that any witness may be impeached by showing his general reputation for truth and veracity in the community in which he lives. (*People v. Nash* (1966), 36 Ill. 2d 275, 222 N.E.2d 473, *cert. denied* (1967), 389 U.S. 906, 19 L. Ed. 2d 223, 88 S. Ct. 222.) A proper foundation for reputation testimony is presented by showing that the reputation witness has adequate knowledge of the person sought to be impeached, and that evidence of reputation is based upon contact with neighbors and associates of the person, "rather than upon the personal opinion of the witness." *People v. Moretti* (1955), 6 Ill. 2d 494, 524, 129 N.E.2d 709.

■■ The record shows that a proper foundation for testimony concerning Errol's reputation was laid by Ms. Livingston's testimony that she knew Errol and had spoken with people associated with Errol. However, the form of the question was improper. Ms. Livingston was not asked whether she had knowledge of Errol's reputation but was asked whether she had an opinion as to his reputation. Also, the question was not limited to Errol's reputation in the community in which he lives. Even if it

can be inferred from Ms. Livingston's testimony that she had knowledge of Errol's reputation and it was limited to the community in which Errol lived due to her limited contacts, the exclusion of the reputation evidence did not constitute reversible error. The admission of evidence is a matter largely within the discretion of the trial court, and its decision should not be reversed unless such discretion has clearly been abused. (*Needy v. Sparks* (1st Dist. 1977), 51 Ill. App. 3d 350, 366 N.E.2d 327.) The record shows that Errol testified that he did not tell the truth on several occasions and told different stories about the cause of his injuries. Errol's foster mothers and a social worker also testified that Errol told varying stories about the cause of his injuries. Since the trial court was aware of specific instances when Errol did not tell the truth, the court did not abuse its discretion in excluding Ms. Livingston's testimony concerning Errol's general reputation for truth and veracity.

## V.

■■ Respondents next contend that the trial court erred in admitting certain photographs into evidence. Two sets of photographs were introduced into evidence by the State over objection by respondents. The first set, which was identified by the coroner's pathologist, portrayed the body of Michelle. The second set, which was identified by an evidence technician with the Skokie Police Department, portrayed the bathroom and bedroom at the Bariffe residence on the day Michelle died and the body of Michelle in the emergency room at Skokie Valley Hospital. On appeal, respondents contend that the court erred in admitting the photographs because they were prejudicial and irrelevant. The State contends that the court acted within its discretion in admitting the photographs because the photographs tended to establish facts in issue. None of the photographs was included in the record on appeal.

The admission of photographs is within the discretion of the trial court, and the exercise of that discretion will not be disturbed unless it is shown that there has been an abuse of discretion to the prejudice of the complaining party. (*People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771.) To be admissible photographs must have some probative value and must correctly portray what they purport to show. (*People v. Nicholls*; *LeMaster v. Chicago Rock Island & Pacific R.R.* (1st Dist. 1976), 35 Ill. App. 3d 1001, 1024, 343 N.E.2d 65.) Photographs may be admitted to show the physical condition of a person at a particular time, or the existence, nature and location of wounds or injuries. (*LeMaster v. Chicago Rock Island & Pacific R.R.*) The fact that a photograph is of a gruesome nature does not necessarily render it inadmissible. *People v. Speck* (1968), 41 Ill. 2d 177, 202, 242 N.E.2d 208.

The record in the present case does not establish that the trial court

abused its discretion in admitting the photographs. The extent of Michelle's injuries, and the cause of her death were presented to establish an injurious environment and were facts in issue. Based upon the description of the photographs in the record, it cannot be concluded that the trial court abused its discretion in admitting the photographs or that the photographs were not relevant to facts in issue.

For the above mentioned reasons, the adjudications of wardship and the dispositional orders of the circuit court of Cook County are affirmed.

Affirmed.

STAMOS, P. J., and DOWNING, J., concur.