682 N.E.2d 300 (1997)
289 Ill. App.3d 613
224 Ill.Dec. 739
In re J.W., a Minor (The People of the State of Illinois,
v.
April W., Respondent-Appellee.)
No. 1-95-3373.
Appellate Court of Illinois, First District, Fourth Division.
June 26, 1997.
*301 Rita A. Fry, Cook County Public Defender, Chicago (William M. Brennan, of counsel), for Appellant.
Richard A. Devine, State's Attorney of Cook County, Chicago (Renee Goldfarb, Nancy Grauer, of counsel), for Petitioner-Appellant.
Office of the Public Guardian, Chicago (Patrick T. Murphy, Lee Ann Lowder, Maureen T. Duffy, of counsel), for Minor-Respondent-Appellee, J.W.
Justice CERDA delivered the opinion of the court:
We are asked to decide whether evidence of prenatal alcohol abuse, other than that resulting in fetal alcohol syndrome (see 705 ILCS 405/2-18(2)(c) (West 1994)), can properly be considered in determining whether a minor's environment after birth is injurious to his welfare.
Following an adjudicatory hearing, the trial court found that the minor, J.W., was neglected. At a dispositional hearing, the court adjudicated J.W. a ward of the court, finding that J.W.'s mother, respondent April W., was unable and unwilling to care for J.W. The trial court also found that it was in J.W.'s best interests to be placed in guardianship. On appeal, respondent argues that the neglect finding must be reversed because the evidence of respondent's alcohol use did not prove that J.W.'s environment was injurious. *302 Respondent also contends that because the Department of Children and Family Services (DCFS) failed to make reasonable efforts to help her find housing, her lack of permanent housing cannot serve as a basis for a finding of neglect by reason of an injurious environment.
J.W. was born on March 5,1995. On April 24, 1995, the State filed a petition for adjudication of wardship, alleging that J.W. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West Supp.1995)) because he was a minor whose environment was injurious to his welfare. The petition also alleged that J.W. was abused pursuant to section 2-3(2)(ii) of the Juvenile Court Act (705 ILCS 450/2-3(2)(ii) (West Supp.1995)) because he was at substantial risk of physical injury as a result of respondent's actions. On the same day, a temporary custody hearing was held where the Public Guardian was appointed to represent J.W. The trial court found that there was probable cause to believe that J.W. was an abused, neglected or dependent minor and that there was an urgent and immediate necessity to remove him from respondent and place him in the temporary custody of DCFS. The trial court also made an oral finding that reasonable efforts could not have prevented the need to remove J.W. from respondent.
At an adjudicatory hearing held on September 18, 1995, the parties proceeded by way of stipulation. It was stipulated that, if called, Dr. Ann Warren, J.W.'s delivering doctor, would testify that at the time of J.W.'s birth, respondent, who appeared to be intoxicated, stated she had been drinking and had become intoxicated every two weeks during her pregnancy. The State then requested that J.W.'s medical records be admitted as evidence. Each of the parties published portions of those records.
The relevant portions of J.W.'s medical records, both published and unpublished, are as follows. The hospital discharge summary indicated that J.W. was born with apnea of prematurity, or breathing difficulties, for which he required monitoring. This report also indicated that J.W. had a heart murmur. The summary further provided that J.W. would need extensive medical monitoring including examination by a private pediatrician one week after discharge, a hearing screening performed in one to two months, and blood tests in two weeks. J.W. also required an eye examination for retinopathy of prematurity two to three weeks after his discharge. Retinopathy of prematurity, also known as retrolental fibroplasia, is "abnormal replacement of the sensory retina by fibrous tissue and blood vessels, occurring mainly in premature infants having a birth weight of less than 1500 [grams] who are placed in a high oxygen environment." Illustrated Stedman's Medical Dictionary 529 (24th ed.1982). Additionally, J.W. needed a repeat pneumogram, or breathing test, performed in two to three months time. The report indicated that further management of J.W.'s apnea would be based on the results of the pneumogram.
A social service report dated March 6, 1995, indicated that J.W. was referred to social services because he was born prematurely with a low birth weight of two pounds and fifteen ounces due to probable alcoholism and smoking by respondent during her pregnancy. At that time, respondent stated that she was living with J.W.'s father in Barrington, Illinois. An entry dated March 24,1995, indicated that respondent said she was living with her grandfather's son in Northfield. However, she had given hospital personnel the telephone numbers of her former husband and a friend as a means of contacting her. Respondent stated that she intended to get an apartment in Wauconda or Barrington. She also intended to get a job, possibly in a currency exchange owned by some friends. The entry noted that respondent often spoke of her devotion to J.W. and his importance to her. This was confirmed by nurses who observed her visits with J.W. Respondent appeared to be happy and to have bonded with J.W. She had no objections to a public health nurse making home visits when J.W. was released from the hospital. Respondent also indicated that she intended to complete a program to get back her driver's license, which she had lost due to driving under the influence.
An April 7 entry indicated that respondent still did not have a stable address and that *303 the social services worker suspected that respondent was living with her former husband. Respondent stated that she was trying to get an apartment nearby and that she would be working at a beauty shop in Fox Lake, where she would bring J.W. during the day. An entry dated April 14 stated that when respondent called the hospital on April 13, she sounded intoxicated. On April 17, respondent called the hospital and said she would be going to North Dakota to visit her father, who was reportedly ill. However, during an April 18 visit, respondent refused to leave her parent's telephone number, stating "I'm not going to give a number now, I'm in a hurry." That day respondent stated she would be going to a condominium in Winnetka or Northfield. She later stated that the condominium had no telephone. An April 21 entry indicated that social services had attempted to get telephone service reconnected in the Northfield condominium and learned that it might be possible to get restricted telephone service.
At the conclusion of the adjudicatory hearing, the trial court found that J.W. was a neglected minor because his environment was injurious. The case proceeded to a dispositional hearing, where a Catholic Charities worker, Susan Davis, testified that she was assigned to J.W.'s case. A service plan had been developed for respondent, but she had not yet cooperated. Respondent was scheduled to begin alcohol abuse treatment the day after the dispositional hearing. She had been referred for such treatment four or five times previously but had failed to follow through on those referrals. Respondent had completed a two day detoxification program to which she was referred after smelling of alcohol during a home visit. Respondent had competed a psychological examination the week before the hearing, but a written report was not yet available. She had missed her first three appointments for the psychological examination. Respondent informed Davis that she had rented a room in a house the week prior to the dispositional hearing, but Davis had not yet been able to confirm this. Respondent had been referred to the Lake County Housing Authority for housing assistance. At the time of the dispositional hearing, J.W. was no longer in need of an apnea monitor, and respondent was visiting him weekly.
The trial court found that respondent was unable and unwilling to care for J.W. It also found that reasonable efforts had been made and that appropriate services aimed at family reunification had so far failed. J.W. was placed under the guardianship of DCFS.
Respondent first argues that evidence of her alcohol use did not prove that J.W.'s environment was injurious. She contends that it was improper for the trial court to consider evidence that she drank during her pregnancy because the Juvenile Court Act does not apply to fetuses. Respondent also contends that no causal relationship was established between her drinking and J.W.'s medical condition. Finally, respondent contends that the trial court improperly based its finding that J.W. was neglected on "anticipatory neglect."
Neglect is a Parent's failure to exercise the care demanded by the circumstances. In re Brooks, 63 Ill.App.3d 328, 337, 20 Ill.Dec. 39, 379 N.E.2d 872 (1978). It can be either a wilful or an unintentional disregard of parental duty. In re Brooks, 63 Ill.App.3d at 337, 20 Ill.Dec. 39, 379 N.E.2d 872. An injurious environment is "an amorphous concept which cannot be defined with particularity." In re S.D., 220 Ill.App.3d 498, 502, 163 Ill.Dec. 207, 581 N.E.2d 158 (1991). Each case involving allegations of neglect by reason of an injurious environment must be decided on its own facts. In re S.D., 220 Ill.App.3d at 502,163 Ill.Dec. 207,581 N.E.2d 158. The State must prove the allegations of neglect by reason of an injurious environment by a preponderance of the evidence. In re D.M., 258 Ill.App.3d 669, 672, 197 Ill.Dec. 338, 631 N.E.2d 341 (1994). We will not disturb the trial court's finding of neglect unless it is against the manifest weight of the evidence. In re A.D.R., 186 Ill.App.3d 386, 390, 134 Ill.Dec. 308, 542 N.E.2d 487 (1989).
We first consider whether the trial court properly considered evidence of respondent's drinking during her pregnancy and determine that it did. This evidence was not offered to show that respondent provided an injurious environment for the fetus, nor to *304 show that respondent's drinking caused J.W.'s condition. Rather, this evidence was relevant to the issue of whether respondent had a drinking problem that made J.W.'s environment after birth injurious.
Illinois courts have considered evidence of a parent's prior conduct in determining whether a child's environment is injurious. In In re Harpman, 146 Ill.App.3d 504, 100 Ill.Dec. 177, 496 N.E.2d 1242 (1986), the court found that the father's children from his current marriage were abused by reason of an injurious environment. While there was no direct evidence that the father had abused the children from his current marriage, either sexually or otherwise, he had been adjudged unfit two years earlier because he sexually abused his daughters from a prior marriage. In re Harpman, 146 Ill. App.3d at 507-08, 100 Ill.Dec. 177, 496 N.E.2d 1242.
In In re A.D.R., 186 Ill.App.3d 386, 134 Ill.Dec. 308, 542 N.E.2d 487 (1989), the court found that a three-month-old baby's environment was injurious where the child's father had been physically abusing the child's mother for as long as seven years. In re A.D.R., 186 Ill.App.3d at 388, 134 Ill.Dec. 308, 542 N.E.2d 487. The reviewing court noted that it was not necessary to wait until the minor herself became the victim of physical abuse. In re A.D.R., 186 Ill.App.3d at 393, 134 Ill. Dec. 308, 542 N.E.2d 487.
In both In re Harpman and In re A.D.R., the courts properly considered evidence of previous parental conduct in determining whether an injurious environment currently existed. In In re A.D.R., as in this case, the conduct considered predated the child's birth. We find it was proper for the trial court in this case to consider evidence of respondent's drinking during the months preceding J.W.'s birth.
Respondent further asserts that there was no causal relationship established between her drinking and J.W.'s condition and that J.W.'s needs were "quite manageable." The issue before us is not whether respondent's drinking during pregnancy caused J.W.'s medical problems at birth but rather whether J.W.'s environment after his birth was injurious. The trial court based its finding of neglect by reason of an injurious environment on "the mother's use of alcohol immediately prior to and up to and including the point of delivery of the minor, the minor's special needs and the lack of an adequate plan for the minor after the minor was born."
Respondent suggests that J.W.'s needs were not in fact so special, noting that children with such needs "are sent home from hospitals everyday where they are monitored by both machines and appropriate personnel." However, the evidence in this case indicates that respondent had failed to provide a home for J.W. She could not provide a permanent address for hospital personnel during the six weeks that J.W. was hospitalized. When she finally informed hospital personnel that she was moving to a condominium in Northfield, she also indicated that she had no telephone service. Without a permanent address, J.W. could not receive the necessary care from a public health nurse. Without a telephone, respondent would not be able to summon help for J.W. in case of a medical emergency.
In addition to a lack of permanent housing, respondent's apparent drinking problems raise grave concerns about her ability to care for a child with J.W.'s medical problems. Not only was J.W. being released from the hospital on a monitor, but he also needed follow-up examinations with numerous doctors. It is extremely doubtful that respondent would be able to provide the care J.W. needed while she was drinking.
The third prong of respondent's first argument is that the court improperly based its finding on "anticipatory neglect." Respondent argues that because she never had custody of J.W., they had never shared an environment. She contends that the court cannot base its neglect finding on a belief that respondent would neglect J.W. if she were given custody.
Respondent relies on In re Nyce, 131 Ill. App.2d 481, 268 N.E.2d 233 (1971), where the trial court adjudicated an infant minor as being neglected. DCFS had taken custody of the minor while she was in the hospital. The minor's mother was 17 years old and had been adjudicated a ward of the court herself *305 as a neglected minor two years earlier. Nyce, 131 Ill.App.2d at 483-85, 268 N.E.2d 233. At the adjudicatory hearing, a DCFS employee testified that he did not believe the mother would be a "fit and proper mother." The mother testified that she was living with a couple who had expressed interest in adopting both her and the infant child. Nyce, 131 Ill.App.2d at 484-85, 268 N.E.2d 233. The reviewing court reversed, finding that the minor was not neglected. The court noted that it could "not conceive of how the allegations of the petition could have been established in a case such as the present where it is clear from the record that the parent never had custody of the child." Nyce, 131 Ill.App.2d at 486-87, 268 N.E.2d 233.
This case differs substantially from Nyce. The mother in Nyce had a stable home and there was no evidence that she was not able to properly care for her child. In this case, however, respondent had no permanent address. When she finally informed the hospital staff that she had found a place to live, she also indicated that she had no telephone service. Due to J.W.'s medical condition, he required home monitoring and visits by a public health nurse. The evidence also indicated that respondent had a drinking problem, which could affect her ability to care for J.W.
We reject respondent's argument that the court could not adjudicate J.W. neglected when he had never been in her physical custody. In In re B.C., 262 Ill.App.3d 906, 200 Ill.Dec. 231, 635 N.E.2d 570 (1994), the State filed a petition alleging that B.C. and her two brothers were neglected because their environment was injurious to their welfare. The evidence at the temporary custody hearing revealed that the mother, while intoxicated, had bitten one of B.C.'s brothers and then disappeared. She was arrested approximately one month later and was again intoxicated. Additionally, she had been failing to take B.C.'s brother to his doctor appointments. In re B.C., 262 Ill.App.3d at 908, 200 Ill.Dec. 231, 635 N.E.2d 570. At the time, B.C. was not living with the mother. B.C.'s mother had previously left B.C. with her godmother without providing any instructions. In re B.C., 262 Ill.App.3d at 909, 200 Ill.Dec. 231, 635 N.E.2d 570. The trial court found probable cause existed to remove B.C.'s brothers from their mother's care but dismissed the petition regarding B.C. The reviewing court reversed this dismissal, noting the fact that B.C. lived with her godmother was irrelevant because B.C.'s mother retained legal custody and could retrieve her daughter at any time. The court found that "this possibility of removal left B.C. subject to the abuse and neglect." In re B.C., 262 Ill.App.3d at 908-09, 200 Ill.Dec. 231, 635 N.E.2d 570.
Similarly, we do not believe it was necessary for the trial court to first release J.W. to his mother's physical custody before finding that his environment was injurious. "Parents have the duty to protect their children from harm, and their refusal to provide their children with safe and nurturing shelter clearly falls within the concept of statutory neglect." In re M.K., 271 Ill.App.3d 820, 208 Ill.Dec. 242, 649 N.E.2d 74 (1995). Respondent clearly could not provide J.W. with the type of shelter or extensive care he needed.
Respondent also argues that because DCFS failed to make a reasonable effort to help her find housing, her lack of housing cannot serve as a basis for the injurious environment finding. We need not address this argument because we find that evidence of respondent's alcoholism was a sufficient basis to support the finding that J.W. was neglected because his environment was injurious.
The judgment of the circuit court is affirmed.
Affirmed.
WOLFSON, P.J., and BURKE, J., concur.