727 N.E.2d 667 (2000)
312 Ill. App.3d 800
245 Ill.Dec. 220
In re Z.Z., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
K.P., Respondent-Appellant).
No. 2-98-1622.
Appellate Court of Illinois, Second District.
April 6, 2000.
Jay Wiegman (Court-appointed), Wiegman Law Office, Somonauk, for K.P.
*668 David R. Akemann, Kane County State's Attorney, St. Charles, Martin P. Moltz, Deputy Director, Gregory L. Slovacek, State's Attorneys Appellate Prosecutor, Elgin, for the People.
Justice McLAREN delivered the opinion of the court:
Respondent, K.P., appeals the circuit court's order finding her daughter, Z.Z., neglected. She contends that the court erred by failing to state in writing the factual basis for its determination and that its finding that Z.Z. was neglected was against the manifest weight of the evidence.
Z.Z. was born May 16, 1998. She was immediately removed from respondent's custody because respondent had used marijuana just before the minor's birth.
On September 23, 1998, the State filed a petition to have the minor adjudicated neglected. The minor's father, J.Z., was also named but is not a party to this appeal. The petition alleged that the minor's environment was injurious to her welfare because her sister, A.Z., was then in the custody of the Department of Children and Family Services (DCFS), her parents had been unsuccessful in their efforts to regain custody of A.Z., and respondent had a history of violent and impulsive behavior that created a risk of harm to Z.Z. In addition, the petition alleged that the minor's environment was injurious because respondent had tested positive for marijuana.
At a hearing on the petition, Officer Matt Udelhoven of the Elgin police department described an encounter with respondent in August 1997. He was flagged down by someone who had seen a female climbing a second-floor balcony at a nearby apartment building. When he arrived, he found respondent on the balcony. An infant was in the hallway nearby. Respondent said that the apartment was her mother's, that respondent lived there, and that she had forgotten her key.
Udelhoven and respondent knocked on the door, but no one answered. Respondent gradually became "excited or uncooperative" and increasingly angry at the baby. A neighbor brought a bottle of milk and respondent shoved it in the baby's mouth. Respondent repeatedly swore at the baby, demanding that she "just drink the F-ing milk."
As Udelhoven pressed respondent about where she would stay and what she would eat, respondent became agitated. She began swearing at the officer, stating that "she didn't care what would happen to her or the F-ing baby." When respondent again put the bottle in the baby's mouth, telling her to "shut the F up," Udelhoven took the baby into protective custody.
Toni McWilliams, a DCFS investigator, saw respondent in October 1997 at the DCFS office. Respondent had with her an unknown child with a bloody nose. When McWilliams asked respondent about the injury, she became upset and swore at McWilliams. State police officers eventually escorted respondent from the building.
In May 1998, McWilliams received a hotline call about respondent. McWilliams visited respondent in the hospital, where she had just given birth to Z.Z. Respondent said she would "go insane" if DCFS took the new baby. However, respondent admitted that she had smoked marijuana the day before she delivered Z.Z. McWilliams thus took Z.Z. into protective custody.
Julie Klco conducted a court-ordered psychological examination of respondent. The latter expressed her displeasure at being there by repeatedly swearing at Klco. However, respondent eventually calmed down and the evaluation was completed in one day.
Klco subsequently counseled respondent. Klco found that respondent had suffered significant trauma, having been poorly parented and abused by her mother's paramours. As a result, she began using *669 alcohol and marijuana in her early teens. Respondent said that at one time she was drinking alcohol every day.
After conducting several tests, Klco found respondent's full-scale IQ to be 77, which is in the borderline range. Klco found respondent to be needy, depressed, and low in self-esteem. Klco concluded that respondent was then incapable of parenting because she was impulsive and prone to violence. During cross-examination, respondent's counsel repeatedly asked Klco whether respondent's score on the IQ test could have been the result of malingering. Klco did not think it was likely.
J. Chris Hinde, a follow-up caseworker for DCFS, testified that respondent was cooperative when he first received the case. However, her cooperation deteriorated after she lost her job. Among the tasks respondent had to complete after A.Z. was adjudicated neglected was a substance abuse evaluation. Respondent never had an evaluation, although each of her subsequent drug tests was negative. Hinde questioned the validity of the results because respondent had bragged to him that she could "beat the test."
Hinde recounted instances where respondent "snapped" at people, although she always calmed down afterward. Hinde had reservations about respondent's parenting ability until she completed anger management evaluation and counseling. According to Hinde, respondent completed a parenting course, achieving a passing grade on the final examination.
At the close of the State's case, respondent moved for a continuance to obtain her own psychological experts. The trial court denied the motion and respondent rested without presenting any evidence. The trial court found the minor neglected and respondent appeals.
Respondent first contends that the neglect finding must be reversed because the trial court's order does not contain specific, written findings as required by section 2-21 of the Juvenile Court Act of 1987 (705 ILCS 405/2-21 (West 1998)). The State responds that the court explained its findings orally, and it would elevate form over substance to reverse the neglect adjudication on the basis of a purely formal defect that did not prejudice respondent.
Section 2-21 provides that if the court finds that a minor is neglected "the court shall then determine and put in writing the factual basis supporting that * * * determination." 705 ILCS 405/2-21(1) (West 1998). Respondent relies on In re M.Z., 294 Ill.App.3d 581, 229 Ill.Dec. 99, 691 N.E.2d 35 (1998), and In re Dependency of Bartha, 87 Ill.App.2d 263, 230 N.E.2d 886 (1967), to argue that the lack of written findings requires the reversal of the order. However, in those cases, the reviewing courts were unable to discern from any source the basis of the lower courts' rulings. Here, the trial court made explicit oral findings on the record. Respondent neither contends that the oral findings are inadequate nor claims prejudice from not having the findings in writing. Under these circumstances, we agree with the State that it would be a waste of judicial resources to remand this cause solely to allow the trial court to reiterate its findings in a written order. However, we admonish trial courts that there is a definite purpose for the statutory requirement. The written order would set forth the grounds for a termination of parental rights if there were no reasonable efforts to correct the grounds that resulted in the original adjudication of the child. See 750 ILCS 50/1(D)(m) (West 1998). Placing an order of record constitutes the benchmark for rehabilitation and progress in each particular case.
Respondent's primary argument on appeal is that the trial court's finding that Z.Z. was neglected is against the manifest weight of the evidence. Respondent's argument is as follows. The State did not prove that Z.Z.'s environment was injurious because there was no evidence that respondent's conduct posed a direct threat *670 to Z.Z. According to respondent, A.Z. was adjudicated neglected solely because respondent did not keep her immunizations current and there is no indication that she will make the same mistake with Z.Z. Respondent has made substantial progress toward having A.Z. returned to her. Respondent's outbursts have been directed solely against authority figures who she believes are unreasonably interfering with her life. Eventually, respondent calms down and cooperates. There is no indication that she would be violent toward Z.Z. Finally, respondent's drug use was limited to a single occasion and there is no indication that her drug abuse poses a long-term threat to the children.
In an adjudication of wardship, the State must prove an allegation of neglect due to an injurious environment by a preponderance of the evidence. In re S.D., 220 Ill.App.3d 498, 502, 163 Ill.Dec. 207, 581 N.E.2d 158 (1991). An injurious environment is an amorphous concept that cannot be defined with any specificity. In re J.W., 289 Ill.App.3d 613, 617, 224 Ill. Dec. 739, 682 N.E.2d 300 (1997). We will not disturb the trial court's finding of neglect unless it is against the manifest weight of the evidence. J.W., 289 Ill. App.3d at 617, 224 Ill.Dec. 739, 682 N.E.2d 300.
We note that the facts outlined above are essentially those stated in the parties' briefs. The State's response to the appellant's arguments is essentially nine sentences containing general denials to the points raised with references to 165 places in the record. We do not believe this portion of the State's brief comports with the requirements of Supreme Court Rule 341(e)(7) via Rule 341(f) (134 Ill.2d Rs. 341(e)(7), (f)). If this were all of the evidence the court heard, we would be inclined to agree with respondent that the State failed to prove a substantial threat to the minor's safety.
This court reviewed the 242 pages of transcript contained in the 165 cites to glean the following evidence not mentioned in the briefs. Much of this additional evidence came from Klco, who testified about things that respondent told her during their sessions. Hinde also testified at length about his personal experiences and conversations with respondent.
First, considerable evidence suggests that respondent's anger was not merely directed against authority figures. Respondent admitted striking J.Z. The testimony shows that they argued throughout the pendency of the case and visitations often had to be ended early because of these arguments.
Hinde testified that respondent was also seeing another man, Jamie, during this time. Once respondent struck Jamie "in a sensitive area." On other occasions, respondent threatened a caseworker and, prior to Z.Z.'s birth, threatened to kill the fetus.
Respondent was abused by Jim Pender, her mother's live-in boyfriend. On at least one occasion, Pender threatened to stab respondent and respondent threatened to stab Pender. According to Hinde, a police officer described seeing respondent handle A.Z. "like a rag doll" and shove a bottle in her mouth.
Contrary to respondent's portrayal, this evidence does not show merely a lack of respect for authority or frustration with perceived meddling in her life. The evidence demonstrates, as Hinde concluded, that respondent cannot control her anger. When considered along with the incident Udelhoven described involving A.Z. and respondent's unwillingness to explain what happened to another child in her custody who had a bloody nose, these incidents demonstrate a history of domestic violence that does pose a direct threat to the minor's safety.
Second, the evidence shows that respondent's substance abuse was not confined to a single, isolated incident as she suggests. Respondent once told Klco that she had gotten drunk every day for a time. She described numerous drinking binges that evidently continued while she was pregnant with Z.Z. Klco believed that respondent's main interests were "partying *671 and fighting." Respondent did not feel she should have to give up "partying and being a teenager." Although all respondent's drug tests came up negative, respondent repeatedly boasted that she knew how to beat the tests, and Klco believed that she knew how to do so. Although isolated incidents of a parent's drug usage do not necessarily pose a danger to a child (see In re S.J., 233 Ill.App.3d 88, 118, 174 Ill.Dec. 259, 598 N.E.2d 456 (1992)), obviously an ongoing pattern of substance abuse can create an injurious environment.
Third, evidence shows that respondent simply did not take her parenting responsibilities seriously and was not motivated to change her behavior. As noted, she did not want to give up "partying" and continued to view this as her first priority. She told Hinde that she did not think counseling had any value and the whole process was a "waste of time." Hinde said that, although she technically achieved a passing score in her parenting class, she viewed the class as "stupid," and he did not think she really got anything out of it. Finally, respondent told Hinde that she was becoming "bored" with the legal proceedings. The record reflects that she left the courtroom during closing arguments at the hearing on the neglect petition.
The evidence outlined above amply supports the trial court's finding that the minor's environment is injurious to her welfare. The court could find that respondent has a history of domestic violence, cannot control her temper, has an ongoing substance abuse problem which she is unmotivated to change, and views all efforts to help her address these problems as a waste of time.
The judgment of the circuit court of Kane County is affirmed.
Affirmed.
THOMAS and RAPP, JJ., concur.