

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-81,532-01

### Ex parte BERNHARDT TIEDE, II, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 1997-C-103-A IN THE 123RD DISTRICT COURT
### FROM PANOLA COUNTY

**KELLER, P.J., filed a dissenting opinion in which KEASLER and HERVEY, JJ., joined.**

In *Saldano v. State*, where the Texas Attorney General confessed error in a death penalty case, we denied Saldano relief, saying, "A confession of error by the prosecutor in a criminal case is important, but not conclusive, in deciding an appeal."[1]  We referred to the Supreme Court's comments on the same issue:

> The public trust reposed in the law enforcement officers of the Government requires that they be quick to confess error when, in their opinion, a miscarriage of justice may result from their remaining silent.  But such a confession does not relieve this Court of the performance of the judicial function.  The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight, but our judicial obligations compel us to examine independently the errors confessed.  The public interest that a result be reached which promotes a

---

[1] *Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App. 2002).

well-ordered society is foremost in every criminal proceeding. That interest is entrusted to our consideration and protection as well as to that of the enforcing officers. Furthermore, our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties.[2]

These sentiments apply equally to habeas cases. The Court acts in accordance with the prosecutor's recommendation, but in doing so, it grants relief without articulating a rationale, without mentioning the fact that the family of the victim has proffered an amicus brief arguing that relief should be denied, and without addressing the arguments in that pleading.[3]

Especially given the serious nature of the offense of which applicant is admittedly guilty (murder) and the questionable factual basis of applicant's claims (his own self-serving statements), the Court ought to articulate a clear and persuasive rationale for granting relief. I suspect that the Court does not because it simply cannot.

### A. Applicant's Claims and Evidence

Applicant murdered Marjorie Nugent. He does not dispute that. He claims that his punishment would have been less if certain evidence that he now claims is newly available had been presented at trial. Some of this evidence would be his own post-trial statements to mental-health professionals that he suffered childhood sexual abuse from an uncle and adulthood emotional abuse from Marjorie. The remaining evidence would be expert evaluations based upon applicant's new statements. The basic contention is that the alleged abuse caused him to suffer a dissociative episode due to a mental disorder that explained or at least contributed to his decision to kill Marjorie. Applicant contends that this evidence supports a conclusion that he killed Marjorie while in the

---

[2] *Id*. (quoting *Young v. United States*, 315 U.S. 257, 258-59 (1942)).

[3] Because the Court had not done so, I ordered the trial record and read it.

throes of sudden passion, in accordance with the sudden-passion mitigating factor in the murder statute,[4] or that the evidence would at least be generally mitigating as to punishment.[5]

Applicant advances two claims for relief. First, he contends that his allegedly new evidence constitutes scientific evidence that was not available at trial. He does not explain what legal theory this claim encompasses, though he discusses some cases involving actual innocence.[6] Second, he contends that the allegedly new evidence shows that false evidence was presented at his trial. In connection with this claim, he relies upon our false-testimony due-process jurisprudence.[7]

### B. First Claim: New Scientific Evidence

There are two possible legal theories upon which this first claim might rest.

### 1. *Case Law on Newly Discovered Evidence*

Our court-made jurisprudence allows a defendant to obtain relief on habeas corpus on the basis of newly discovered or newly available evidence if such evidence shows that he is (1) actually innocent, (2) guilty only of a lesser-included offense, or (3) ineligible for the sentence imposed.[8] Because applicant concedes that he is guilty of murder, he cannot show actual innocence or guilt only of a lesser-included offense. And his evidence does not show that he is ineligible for the life sentence that was assessed. He has, therefore, failed to establish any basis for relief on a newly

---

[4] *See* TEX. PENAL CODE § 19.02(a), (d).

[5] *See* TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1) ("evidence may be offered . . . as to any matter the court deems relevant to sentencing").

[6] *See*, *e.g.*, *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996).

[7] *See*, *e.g.*, *Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009).

[8] *See State v. Wilson,* 324 S.W.3d 595, 598 (Tex. Crim. App. 2010) (discussing these types of claims).

discovered or newly available evidence claim.

A finding of true on the sudden-passion mitigating factor would limit the punishment range for murder to that of a second-degree felony, two to twenty years.[9] But the allegedly new evidence that applicant relies on does not appear to establish sudden passion. One of the requirements of the sudden-passion mitigating factor is "adequate cause," which is defined as "cause that would produce a degree of anger, rage, resentment, or terror *in a person of ordinary temper*, sufficient to render the mind incapable of cool reflection."[10] "Sudden passion" must also arise "at the time of the offense" and cannot be "solely the result of former provocation."[11] The three examples of "abusive behavior" that applicant claims Marjorie committed are: (1) that she made him shoot armadillos while demeaning and ridiculing him, (2) that she demanded that he shave her legs while she was undressed and massage her back with a vibrator, and (3) that she became extremely critical and accusatory of a friend with whom he was having a clandestine sexual relationship. There is no allegation that any of these behaviors occurred at the time applicant killed the victim, and even if one of these did, these are not the kind of behaviors that would render the mind of a person of ordinary temper incapable of cool reflection. I have found no case in which evidence of this kind would even entitle a defendant to a sudden-passion instruction. But even if applicant were entitled to a sudden-passion instruction, all that means is that a rational factfinder could find in his favor on the sudden-passion issue but would not be obligated to do so. And that is if the factfinder believed Marjorie engaged in these behaviors. A rational factfinder would not even have to believe this testimony, which comes

---

[9] TEX. PENAL CODE §§ 12.33(a), 19.02(d).

[10] *Id.* § 19.02(a)(1), (d) (emphasis added).

[11] *Id.* § 19.02(a)(2).

only from applicant and is self-serving.

### 2. *Article 11.073*

The legislature has passed a statute that authorizes a habeas review of claims based on new scientific evidence.[12] To be entitled to relief under that statute, a habeas applicant must, among other things, obtain a finding that, had the scientific evidence been presented at trial, he "would not have been convicted."[13] Applicant cannot obtain such a finding because the allegedly new evidence does not in any way undermine the jury's verdict of guilt.

### C. Second Claim: False Evidence

Applicant's false-evidence claim is based on due process. The alleged due-process violation is premised on the State's unknowing use of false evidence. The habeas court finds that, being unaware of the abuse applicant suffered, Dr. Gripon unknowingly gave false testimony at trial "both as to his opinion and to the underlying facts involved."[14] Dr. Gripon's opinion at trial was that the information available to him did not support the conclusion that applicant suffered from a dissociative episode caused by a mental disorder.[15]

### 1. *Preservation*

---

[12] TEX. CODE CRIM. PROC. art. 11.073.

[13] *Id.* art. 11.073(b)(2).

[14] Finding 48.

[15] Findings 16-27. *See* especially Findings 20 ("Dr. Gripon also testified that, based on what he had heard, nothing supported a diagnosis of dissociative disorder."), 23 ("Dr. Gripon also testified that, if a person seemed to have a clean bill of mental health, it would certainly not support the idea that they had some dissociative episode at some time several years ago."), 25 ("Dr. Gripon testified that to make an accurate diagnosis of a dissociative disorder, one would need information which suggested that there was some dissociative phenomenon that had previously occurred.").

Applicant failed to preserve this claim at trial. If Dr. Gripon's testimony was false because it was premised on the notion that applicant did not suffer abuse as a child or an adult, applicant could have lodged an objection at trial. "[A]ll but the most fundamental rights are thought to be forfeited if not insisted upon by the party to whom they belong."[16] I have previously taken the position that the State's unknowing use of false testimony ought to fall within the broad category of forfeitable claims when the defendant was aware of the falsity.[17] Such a situation implicates the policy rationale for requiring an objection: To allow "the trial court [to] . . . avoid the error or provide a timely and appropriate remedy[] and the opposing party . . . an opportunity to respond and, if necessary, react."[18] If the trial court and the State are unaware of the falsity of the testimony, how can they correct the situation? Here the trial court, the State, and the State's witnesses were not only ignorant of any alleged abuse applicant suffered, they had absolutely no reason to even suspect that abuse had occurred.

We excuse a defendant's failure to object, if "he could not reasonably be expected to have known that the testimony was false at the time that it was made."[19] But applicant was certainly in a position to know whether he suffered abuse. And while his trial counsel may not have known, the

---

[16] *Moore v. State*, 295 S.W.3d 329, 333 (Tex. Crim. App. 2009) (quoting *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993)).

[17] *See Ex parte Chavez*, 371 S.W.3d 200, 215 (Tex. Crim. App. 2012) (Keller, P.J. dissenting) (arguing "that when the State's use of perjured or false testimony is unknowing, a defendant may not raise his claim for the first time on habeas if he could have raised it at trial or on direct appeal" and that "only the State's mendacity in the 'knowing use' scenario . . . impels us to make an exception to the general rule against the cognizability of claims that could have been raised earlier").

[18] *Thomas v. State*, 408 S.W.3d 877, 884 (Tex. Crim. App. 2013).

[19] *Estrada v. State*, 313 S.W.3d 274, 288 (Tex. Crim. App. 2010).

requirement that a defendant preserve error is not limited to the defendant's attorney. From an error-preservation perspective, the attorney is an agent of the defendant, which is why when an attorney fails to object, that failure is held against the defendant.[20] A defendant cannot withhold information from his attorney and then later use his attorney's ignorance as a basis for excusing the failure to object. If counsel is deficient for failing to investigate the defendant's background for abuse, the defendant may prevail on a claim of ineffective assistance of counsel,[21] but no such claim is before us.

We have said that our false-testimony jurisprudence does not impose a duty on the defendant to incriminate himself in order to potentially avoid the erroneous admission of false testimony,[22] but applicant testified at sentencing, so he waived any right against self-incrimination at that stage.

The concurring opinion states that experts in this case "averred that applicant had been the victim of sexual abuse as a child for many years and had *suppressed his actual awareness of it* to the point that he was incapable of revealing the memories to anyone at his trial." (Emphasis mine). But I see nothing in the expert testimony or documentation that suggests that applicant had suppressed his memory of these events (if they happened). Although the concurrence relies upon Dr. Busch-

---

[20] *New York v. Hill*, 528 U.S. 110, 115 (2000) ("As to many decisions pertaining to the conduct of the trial, the defendant is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney. Thus, decisions by counsel are generally given effect as to what arguments to pursue, [and] what evidentiary objections to raise.") (internal quotation marks and citations omitted); *Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington*, *supra*, we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default.").

[21] *See Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006).

[22] *Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012).

Armendariz's assessment, that witness never suggested that applicant suppressed his memory of the events. Rather, she said that applicant delayed disclosure of abuse because he loved his uncle, his uncle convinced him what was happening was normal, his uncle persuaded him to keep the secret, he wanted to protect his uncle, applicant knew that revealing it would bring shame and embarrassment to his family, and applicant had confused feelings about participating in the acts.

The remaining question, then, is whether applicant may be excused from raising an objection on the ground that the shame of his abuse and his conflicted feelings about it caused him not to reveal that it had occurred. First, while the habeas court did find that it is not unusual for male victims of child sexual abuse to hide the abuse due to shame, the court made no finding that applicant himself hid abuse because he was ashamed. Second, evidence of abuse can be a two-edged sword: It might mitigate against the moral blameworthiness of the defendant's actions, but it also might also tend to show that the defendant is a dangerous individual.[23] Moreover, evidence that criticizes the murder victim might be disbelieved and could serve to alienate the punishment factfinder. An exemption from the contemporaneous-objection rule on the basis that the defendant was an abuse victim would seem to encourage defendants to "lie behind the log" and lodge abuse allegations later if they are dissatisfied with the outcomes of their trials and no longer have anything to lose.[24] Under these circumstances, applicant should not be excused from the obligation to object.

---

[23] *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989) ("Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future.").

[24] *See Ex parte Gutierrez*, 337 S.W.3d 883, 895-96 (Tex. Crim. App. 2011) (Allowing defendants to belatedly seek DNA testing that, for strategic reasons, was not sought earlier would "allow defendants to 'lie behind the log' by failing to seek testing because of a reasonable fear that the results would be incriminating at trial but then seeking testing after conviction when there is no longer anything to lose.").

## 2. *Due Process*

Moreover, due process is about fundamental fairness,[25] and it is difficult to see how a defendant's trial can be rendered fundamentally unfair by a defendant's own failure to disclose information about himself that the State and the State's witnesses did not know and could not have reasonably discovered.[26] In connection with claims regarding the failure to disclose exculpatory evidence, we have said that, when the facts that are not disclosed are "known by the defendant or his counsel, he cannot object on appeal to the failure of the State to disclose the same."[27] The reasoning in our opinion on the first application in *Ex parte Chavez*, where we held that the defendant did not suffer a due-process violation, applies with full force to applicant's case:

---

[25] *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

[26] *See People v. Nash*, 36 Ill. 2d 275, 284, 222 N.E.2d 473, 478 (1966) ("There is a material difference in the *Napue* and *Lueck* cases and this case, however. In *Napue* and *Lueck* the prosecutor did nothing to correct the false testimony and the false testimony was unknown to the defendant at the time of the trial. Here the defendant knew of the false testimony and evidence was presented to show that promises of leniency had in fact been made. Under these circumstances there has not been a denial of due process of law."); *State v. Yates*, 137 N.H. 495, 502-03, 629 A.2d 807, 811-12 (1993) (Thayer, J., dissenting) ("*Mooney*, *Napue*, and *Giglio* stand for the proposition that a prosecutor's use of perjured testimony, which is unknown to the defendant at trial, violates the defendant's due process rights because use of such testimony is fundamentally unfair to the defendant. These cases, however, do not provide guidance for situations where the prosecution used false testimony, but the defendant knew, at trial, that the testimony was false. I in no way condone the knowing use of perjured testimony; however, when such is the case, the defendant is not, as the majority holds, automatically entitled to a new trial. Because the defendant in this case had the ability to cross-examine the witness and impeach his credibility, I would hold that the defendant had a fair trial and would not reverse his conviction. I cannot support setting a precedent that allows defendants to sit on their rights and then claim they were somehow wronged by the judicial system."). The majority in *Yates* placed the responsibility on the State to bring the falsity of the testimony to the attention of the trial court. *Id.* at 500. But the prosecutor was in a position to bring the matter to the judge's attention because he was aware of the falsity of the testimony. *See id.* at 499.

[27] *Carmona v. State*, 698 S.W.2d 100, 105 (Tex. Crim. App. 1985). *See also Chavez*, 371 S.W.3d at 207; *Harris v. State*, 453 S.W.2d 838, 839 (Tex. Crim. App. 1970).

> [E]ven in the context of the failure to disclose exculpatory evidence, we have held that there is no due process violation under circumstances in which the defendant himself already knew about the exculpatory facts . . . . Had he disclosed that information to his trial attorney sooner than he did, counsel could have attempted to investigate the circumstances that corroborated the applicant's account . . . . [A]ny misinformation the jury received to inform its discretionary decision with respect to what punishment to assess the applicant within the statutorily prescribed range would appear to have been his own fault, if anyone's. We cannot conclude on these facts that he received an unfair punishment proceeding.[28]

Applicant's case is much more like a newly-discovered-evidence case than false-evidence cases that we have addressed in the past. There is a real sense in which one can say that there is nothing false about Dr. Gripon's trial testimony. Dr. Gripon accurately testified that the *information available to him at trial* did not support the conclusion that applicant suffered a dissociative disorder. Without any evidence of a dissociative disorder, Dr. Gripon could not conclude that there was one. Dr. Gripon did not purport to be a fact witness with respect to whether applicant had suffered abuse, nor did he evaluate the truthfulness of any of the information submitted to him.[29] And unlike expert witnesses in some of the other cases that have come before us, Dr. Gripon did not inaccurately recite any fact within the realm of his knowledge as an expert or misrepresent something as a valid practice

---

[28] *Ex parte Chavez*, 213 S.W.3d 320, 325 (Tex. Crim. App. 2006). In our opinion on the second application in *Ex parte Chavez*, we suggested that this rule does not necessarily apply to false-evidence claims, but our basis for so suggesting—that the defendant is not required to incriminate himself—does not apply to the present case because applicant testified at the punishment stage of trial. *See Chavez*, 371 S.W.3d at 202-03, 207 (Chavez testified at the guilt stage but not at the punishment stage, and his newly proffered information, that he was only the getaway driver for the robbery, would have been mitigating as to punishment). *See also Carroll v. State*, 42 S.W.3d 129, 132 (Tex. Crim. App. 2001) (defendant's right against self-incrimination still applies to the punishment stage of trial even if he waived the right with respect to guilt).

[29] In *Chavez*, by contrast, there was witness testimony that Chavez was one of the home invaders in the robbery, 371 S.W.3d at 202, which would have been contradicted by Chavez's claim that he was only the getaway driver.

in his field when it was not.[30]

Various types of due-process claims fall along a continuum with one end being concerned primarily with the integrity of the process (knowing use of perjured testimony) and the other end being concerned primarily with the accuracy of the result (newly discovered evidence showing actual innocence). The unknowing use of perjured or false testimony falls between these endpoints.[31] The closer a type of situation is to the "accuracy of the result" endpoint, the more onerous the requirements that we impose on the applicant who seeks relief on the claim.[32] Applicant's case is much closer to the "accuracy of the result" endpoint than the typical false-evidence case. The State and its witnesses were not even negligent about the evidence upon which applicant's claim is based—they could not have known about applicant's alleged history of being abused. Applicant is

---

[30] *See Ex parte Napper*, 322 S.W.3d 202, (Tex. Crim. App. 2010) (analyst's flawed method of calculating the statistical-frequency estimate); *Estrada*, 313 S.W.3d at 287 (prison expert inaccurately recited prison-classification rule). *See also Ex parte Robbins*, 360 S.W.3d 446, 460 (Tex. Crim. App. 2011) (expert retracted earlier opinion that to a reasonable degree of medical certainty, the cause of death was compression asphyxia, due to later experience suggesting that her earlier assessment was incorrect).

[31] *See Ex parte Henderson*, 384 S.W.3d 833, 835 (Tex. Crim. App. 2012) (Price, J., concurring); *Ex parte Robbins*, 360 S.W.3d 446, 464 (Tex. Crim. App. 2011) (Price, J., concurring); *Chavez*, 371 S.W.3d at 216 (Keller, P.J., dissenting).

[32] *Henderson*, 384 S.W.3d at 835 (Price, J., concurring) ("as the particular due process claim moves from the fairness end of the continuum toward the accuracy end, the standard for materiality should rise concomitantly, culminating in the Herculean burden associated with a bare claim of actual innocence"); *id.* (quoting *Robbins*, 360 S.W.3d at 465: "when it comes to claims of the inadvertent use of false evidence, we must not be overly liberal in how we characterize 'false' evidence."); *Chavez*, 371 S.W.3d at 216 (Keller, P.J., dissenting) ("But in the 'unknowing use' context, the culpability of the state actor is not the main issue, if it is an issue at all. When the testimony is perjured, a non-state actor has knowingly subverted the system, but when the testimony is merely false, the relevant actors may have been merely negligent or have no culpability at all. All we can say with certainty is that the showing of materiality for the unknowing use of testimony that is merely false must be at least as strong as the showing required for the unknowing use of perjured testimony, but it is possible that, when perjury is absent, an even stronger showing is required.").

solely responsible for any misleading impression at trial in that regard.[33]

### 3. *Effect of the "New" Evidence*

The jury had before it evidence that applicant had been thinking about killing Marjorie for months and placed the murder weapon where it would be easily accessible, that he hid the murder by telling various lies about Marjorie's whereabouts, that he spent hundreds of thousands of dollars of Marjorie's money after her murder, that he sought a wire transfer of an additional $225,000 of her money, and that he took up with another elderly, wealthy widow after he killed Marjorie. The jury also had before it evidence from applicant's expert witness about dissociative behavior in general and testimony that people in funeral-related jobs tend to develop controlled dissociation.

The jury also had evidence that applicant had spent large amounts of money *before* Marjorie's death, with no explanation for where the money came from. There was testimony that when applicant first went to work at a funeral home in Carthage, the IRS contacted him several times. But by 1994, applicant was giving thousands of dollars to his friend Wyatt Henderson, whom he met at the funeral home. Henderson testified that applicant initially gave him "probably $75,000" to start up a western-wear business. The store went out of business in mid-December of 1997, and by that time applicant had invested "probably $250,000" in the business. Henderson never paid any of the money back to applicant. In addition, applicant spent $25,000 or $30,000 at the store. Aside

---

[33] If the Court is determined to consider applicant's claim despite his procedural default and the lack of any apparent unfairness in the trial proceedings, it ought to at least impose a higher standard of materiality, such as "clear and convincing." In his concurrence in *Chavez*, Judge Womack expressed "difficulty imagining any court's specifically carving out a rule" imposing a higher materiality standard than preponderance of the evidence "in order to let such a conviction stand." *Chavez*, 371 S.W.3d at 211-12 (Womack, J., concurring). But neither he nor I anticipated a case in which the defendant is solely responsible for any false impression that has occurred. This is that case.

from saying he had received somewhere around $15,000 to $18,000 when his grandmother died in 1988, applicant offered no explanation for where he got over a quarter of a million dollars during the last three years of Marjorie's life.

At punishment, more financial information was introduced, particularly about money applicant spent after Marjorie's death. He paid $13,000 for tuition for Chris Permenter and bought him a jet ski for over $7,000. In addition, applicant spent some $51,000 for a business called Carthage Awards, $12,000 for a coin collection, and over $5,000 for furniture. He spent $13,000 on a car for one friend, $11,000 for a pickup truck for another friend, and about $35,000 for a Toyota 4 Runner for his friend Chris. There was also evidence that, months after Marjorie's death, applicant sought a wire transfer of $225,000 of her money by presenting a letter allegedly signed by her.

The jury also saw applicant's confession to the murder. As relevant to whether sudden passion was a viable defense, that confession says:

> I had moved the rifle into the bathroom near the garage. [Marjorie] had walked out into the garage towards my car. I took the rifle and I shot Marjorie in the back. She fell face first. Marjorie was still breathing heavily, so I shot her again. I may have shot her one more time. I didn't want her to suffer. I then dragged Marjorie by the feet from the garage to the freezer. I had taken the food from the freezer. I placed her into the freezer and covered her with a Land's End brand white sheet. I then covered her with the food. I took a water hose and washed the blood from the garage. I swept up the bullets along with some leaves and threw them away.

These actions hardly sound like applicant was "incapable of cool reflection," as required by a sudden-passion defense. Applicant's use, twice, of the past perfect tense in the statement seems to indicate that he had moved the rifle and the frozen food ahead of time, although his trial testimony offered an explanation for the rifle and indicated otherwise as to the frozen food.

Given this and other compelling evidence, I find it unlikely that applicant's "new" evidence

would have made any difference to his jury.

### 4. *Inadequate Record*

Finally, applicant has made these claims of abuse, but how do we know that his claims are true? The Court's opinion states that a "live hearing" was held, but this hearing consisted solely of some testimony from Dr. Gripon, without any cross-examination. The current habeas record contains no indication that the parties have attempted to elicit testimony from the uncle that applicant accuses of molesting him.[34] Whether this uncle molested applicant is the foundation upon which applicant's entire claim rests. The uncle might invoke his right not to testify, but the record contains no indication that he has done so, and if he is willing to testify, the Court ought to hear his side of the story.

And while the habeas court found that there was evidence that the uncle had molested other boys, the habeas record contains only a single, vague reference to such occurrences and does not set out the source of this information.[35] Notably, the habeas record contains no statement or testimony from anyone claiming to be a victim of the uncle's abuse, and of course, there has been no cross-examination of such individuals. There is no sworn testimony that applicant was abused either as a child or by Marjorie; all that applicant has presented is testimony from mental-health experts that

---

[34] The materials in the record indicate that the uncle is still alive, though he is approximately 80 years old.

[35] A report by Dr. Busch-Armendariz states, "His uncle repeatedly sexually abused him and his cousin when they were children. There has also been recent concern from other adults and children that Mr. Tiede's uncle still engages in criminal sexual abuse with young boys." *See also* Finding 32. In his findings, the habeas judge refers to someone named "TH" who was sexually abused by the uncle and came forward with allegations in 2009. Findings 33, 34, 40. I see no evidence in the habeas record to support these findings and the habeas judge does not cite a source for this information.

he told them, after the trial, that he had been abused.

Applicant's new claim that he was abused as a child and as an adult is similar in some respects to recantation cases. In essence, applicant, through his experts and possibly other individuals, is now presenting a new position regarding whether he was abused as a child or by the decedent.[36] Contrary to his current claims, at trial he said that Marjorie was "more possessive" but not exactly "mean" to him.[37]

A recent recantation case is instructive. In *Ex parte Jenkins*, a recent case involving an actual-innocence claim based on a complainant's recantation, the prosecutor recommended granting relief on the basis of an affidavit from the child-victim recanting her allegations.[38] Relying on the prosecutor's recommendation, the trial court recommended that we grant relief. Because there had been no cross-examination of the complainant regarding her recantation and because various people involved in the case had not been heard from (including an aunt upon whom the complainant placed

---

[36] Applicant did not testify at the habeas hearing. It could be argued that he ought to testify and subject himself to cross-examination before we give any credence to his claims. Although a defendant has a right not to testify guaranteed by the Fifth Amendment right against self-incrimination, appellant has already testified at the punishment stage of trial, and it is arguable that he has indirectly testified on habeas through Gripon's testimony and the documents submitted by other experts. *See Lagrone v. State*, 942 S.W.2d 602, 611 (Tex. Crim. App. 1997). Much, if not most, of the evidence upon which he relies would probably not have been admissible had the State objected. (E.g., hearsay evidence that applicant revealed abuse to his psychologist, an affidavit from an expert witness saying that applicant had told him of abusive behavior by Marjorie).

[37] Marjorie was described by her friends as "straightforward," "strong-willed," "honest," "caring," "kind," "known for saying exactly what she thought,""considerate," "a gracious hostess," "quiet-spoken," "reserved," and "pretty snippy," but "not ugly, mean, or possessive" toward applicant. As far as I can tell, the only witnesses who called her "possessive" or "jealous" were applicant and the people for whom he bought cars and other gifts with Marjorie's money.

[38] *Ex parte Jenkins*, No. WR-79,946-01, 2013 WL 5568450 (Tex. Crim. App. October 9, 2013) (not designated for publication).

blame), we remanded the case to the trial court. We said, "We believe that in recantation cases such as this one, before we make the important decision of whether applicant is entitled to relief, the record should be more fully developed." We ordered the trial court to conduct a live evidentiary hearing at which the complainant was to be called to testify, and we ordered the court to give notice and an opportunity to testify to all those who participated in the trial or investigation.[39] After a full hearing at which the victim and previously uncalled witnesses took the stand and testified, under oath and subject to cross-examination, it became clear that the applicant was not entitled to relief. The trial judge changed his recommendation, and we denied relief. That is the power of cross-examination. That is what has not occurred in this case.

Moreover, at the habeas hearing, the judge specifically asked the prosecutor whether the victim's family had been notified of the hearing and the prosecutor said that it had. But the family's motion to file the amicus brief says that this is "untrue." The victim's son swears that:

> [N]either I nor my family was contacted and no attempt was made to contact me or my family by District Attorney Danny Buck Davidson, or anyone in his office, or on his behalf regarding new information or developments in the criminal case against Bernhardt Tiede, II, the man convicted of my mother's murder. I was informed of the hearing regarding the Writ of Habeas Corpus by my wife, who was called a couple of hours before the hearing by a colleague, who was informed of the hearing by a reporter from the Texas Tribune. We found out the time of the hearing just a couple of hours before it was set to begin, without enough time to make the trip to attend.

This is a serious allegation. Ordinarily, evidentiary materials should be submitted to the convicting court instead of this Court.[40] Although we might have the implicit authority to consider such materials, normally the jurisprudential considerations of efficiency, effectiveness, and comity to the

---

[39] *Id.*

[40] *Ex parte Whisenant*, WR-82,063-01 (Tex. Crim. App. Oct. 15, 2014).

convicting court counsel against us doing so. The habeas court is far better situated to resolve this particular conflict, and a remand to that court would allow it to decide the matter. Considering the habeas court's specific inquiry into whether the family had been notified, I would expect that the court would want the chance to address the issue. And considering that the District Attorney's integrity has been impugned, I would expect that he would also want the chance to address this issue.

For all of these reasons, we should be circumspect about applicant's claims. We should keep in mind that Marjorie Nugent cannot take the stand to controvert applicant's allegations of emotional abuse because she is dead, having been shot in the back by applicant four times before having her body hidden for months in a freezer. And while applicant has marshaled experts who appear to believe his allegations, "experts . . . are not human lie detectors," they are not clairvoyant, and we have rejected the notion that experts can or should replace the factfinder "as the ultimate arbiters of credibility."[41]  Quite simply, we have not heard from some of the major players in this case (applicant, his uncle, the other alleged sexual-abuse victims, members of the Nugent family), and applicant's case has not been subjected to adversarial testing.

The State has recommended that applicant obtain relief in this case, but the recommendation of the prosecutor (and that of the trial court) is not binding on this Court. The fact that the prosecutor here agrees to relief does not authorize us to ignore the law. As was the case in *Jenkins*, the lack of adversarial testing of the evidence presented at the habeas hearing leaves us with no reliable evidence upon which to base a grant of relief. Moreover, even if the evidence were reliable, I see no legal basis upon which applicant can base a legitimate claim. Applicant had the burden to raise a valid

---

[41] *Yount v. State*, 872 S.W.2d 706, 710 (Tex. Crim. App. 1993) (quoting John E. B. Meyers et al, *Expert Testimony in Child Sexual Abuse Litigation*, 68 NEB. L. REV. 1, 121 (1989)). *See also Schutz v. State*, 957 S.W.2d 52 (Tex. Crim. App. 1997).

legal claim and support it with evidence; he has failed to do so.

I would deny relief. Alternatively, I would remand for a more extensive live evidentiary hearing, as we did in *Jenkins*. At the very least, I would remand for the habeas court to determine whether the family was notified of the habeas hearing and to address any subsequent issues that might arise from that determination. I respectfully dissent.

Filed: November 26, 2014
Publish